STROUD, Judge.
 

 *515
 
 I. Introduction
 

 This case arises from this Court's prior opinion issued on 21 June 2016 in
 
 Long v. Currituck County
 
 , --- N.C. App. ----,
 
 787 S.E.2d 835
 
 (2016), which held that under Currituck County's Unified Development Ordinance § 10.51, Plaintiff's proposed "project does not fit within the plain language of the definition of Single Family Dwelling, and thus is not appropriate in the SF District."
 

 Id.
 

 at ----,
 
 787 S.E.2d at 841
 
 . While
 
 Long
 
 was pending before this Court, Plaintiff was warned of the possible consequences of proceeding with construction of the project if the trial court's order in that case was reversed on appeal, but she decided to build the project anyway. After Defendant took action to comply with this Court's ruling in
 
 Long
 

 ,
 
 issued on 21 June 2016, Plaintiff sought and obtained a preliminary injunction issued on 9 June 2017 which required Defendant to "deem the home approved by the County building permit issued in March 2015 to be a single-family detached dwelling for purposes of the Currituck County Unified Development Ordinance" and to allow her to complete construction and occupancy of the project. Defendant appealed the preliminary injunction. Although Plaintiff's complaint includes many claims in her attempt to prevent Defendant from enforcing the Unified Development Ordinance in accordance with this Court's opinion in
 
 Long
 
 , --- N.C. App. ----,
 
 787 S.E.2d 835
 
 , Plaintiff has not demonstrated that she is likely to prevail on any of her claims, and therefore the preliminary injunction must be reversed.
 

 II. Background
 

 On 27 March 2017, Plaintiff filed this action seeking a declaratory judgment, preliminary injunction, permanent injunction, monetary damages, and attorney fees. On 9 June 2017, the trial court entered a preliminary injunction ordering Defendant to "deem the home approved by the County Building permit issued in March 2015 to be a single-family detached dwelling for purposes of the Currituck County Unified Development Ordinance;" to rescind the Stop Work Order issued in September 2016 and the Notice of Violation issued in February 2017; and to permit Plaintiff to complete construction of her project and then allow occupancy.
 

 Plaintiff sought the preliminary injunction and other relief to prevent Defendant from complying with this Court's ruling issued on 21 June
 
 *516
 
 2016 in
 
 Long
 
 , --- N.C. App. ----,
 
 787 S.E.2d 835
 
 . Plaintiff was a party to
 
 Long
 
 and that case dealt with the same project and the same provisions of the Currituck County Unified Development Ordinance ("UDO") as this case.
 
 See generally
 
 id.
 

 In
 
 Long
 
 , the petitioner-plaintiffs appealed
 

 *79
 
 a Superior Court (1) DECISION AND ORDER affirming the Currituck County Board of Adjustment's decision that a structure proposed for construction on property owned by Respondent Elizabeth Letendre is a single family detached dwelling under the Currituck County Unified Development Ordinance and a permitted use in the Single Family Residential Outer Banks Remote Zoning District and dismissing petitioners' petition for writ of certiorari and (2) ORDER denying petitioners' petition for review of the Currituck County Board of Adjustment's decision and again affirming the Currituck County Board of Adjustment's decision.
 

 Id.
 

 at ----,
 
 787 S.E.2d at 836
 
 (quotation marks omitted). In other words, the preliminary injunction on appeal ordered Defendant to "deem" Plaintiff's project which was under construction during the pendency of the appeal of
 
 Long
 
 "to be a single-family detached dwelling" under the Currituck County UDO, although this Court held in
 
 Long
 
 that her house is
 
 not
 
 a single-family detached dwelling as defined by the Currituck County UDO.
 
 See
 

 id.
 

 , --- N.C. App. ----,
 
 787 S.E.2d 835
 
 .
 

 Plaintiff described her plan to build the house which is the subject of this case, and was the subject of
 
 Long
 
 , in her complaint as follows:
 

 4. LeTendre bought the Lot on the open market in April 2012 for a purchase price of $530,000.00.
 

 5. From the time that LeTendre bought the Lot in April 2012, through the present time, the Lot has had a Single Family Residential Outer Banks Remote ("SFR") zoning classification assigned to it by Currituck County.
 

 6. Under Currituck County's Unified Development Ordinance ("UDO"), developments that are permitted on properties with a SFR zoning classification include single-family detached dwellings.
 

 7. Section 10.51 of the UDO defines a "single-family detached dwelling" as a "residential building containing not more than one dwelling unit to be occupied by one family, not physically attached to any other principal
 
 *517
 
 structure. For regulatory purposes, this term does not include manufactured homes, recreational vehicles, or other forms of temporary or portable housing. Manufactured buildings constructed for use as single-family dwelling units (manufactured home dwellings) are treated similar [sic] to single-family detached dwellings."
 

 8. Neither Section 10.51 of the Currituck County UDO, nor any other provision of the Currituck County UDO, limits the square footage that a single family detached dwelling may have.
 

 9. Neither Section 10.51 of the Currituck County UDO, nor any other provision of the Currituck County UDO, limits the number of bedrooms that a single-family detached dwelling may have.
 

 10. Neither Section 10.51 of the Currituck County UDO, nor any other provision of the Currituck County UDO, limits the number of rooms that a single family detached dwelling may have.
 

 11. After buying the Lot in April 2012, LeTendre engaged an architect to develop plans for a home to be built on the Lot. LeTendre's architect first developed plans for a home ("Disconnected Home") with one central wing and two side wings. The two side wings would not be connected to the central wing, and instead unenclosed decking would run between the central wing and each side wing, such that a person would have to step outside of the Disconnected Home in order to travel from wing to wing. The three wings would not have connected rooflines. On the plans for the Disconnected Home, because the three wings were not connected, the architect labeled each of the three wings as a separate "building." Those plans were never utilized, and the Disconnected Home was never built.
 

 12. LeTendre's representatives later sought guidance from the County regarding what type of development on the Lot would qualify as a single-family detached dwelling under the Currituck County UDO. LeTendre's representatives met with the County Planning Director and the County Attorney in 2013. At that meeting, the County Planning Director advised LeTendre's
 
 *80
 
 representatives
 
 *518
 
 that, if the three wings had a connected roof and were connected by air-conditioned hallways that allowed for the free flow of heating and air conditioning, the resulting home would qualify as a single-family detached dwelling under the UDO. The County Planning Director did not claim that the three wings would need to have a common foundation in order for the home to qualify as a single-family detached dwelling.
 

 13. Based on this guidance from the County Planning Director, LeTendre's architect developed a new set of plans for a different home for the Lot. This home ("Home") would also have a central wing and two side wings. But unlike in the Disconnected Home, the Home's side wings would be connected with the central wing by two enclosed, air-conditioned hallways. These hallways would allow for the free flow of heating and air conditioning, and they also would allow a person to walk throughout the Home, including all three wings, without ever stepping outside. The three wings in the Home would have a common, integrated roofline.
 

 14. Although the plans for the Home showed that the three wings would be interconnected and would have a connected roofline, through inadvertence these plans continued the practice from the Disconnected Home's plans of labeling each wing as a separate "building."
 

 15. In October 2013, LeTendre submitted the plans ("Plans") for this Home to Currituck County for the County to formally confirm that the Home would be a permissible single-family detached dwelling that would be permitted on the Lot under the County's UDO.
 

 16. The Plans showed that each wing would be slightly less than 5,000 square feet in size, and they showed that the Home would also have a detached pavilion as an accessory structure.
 

 17. The Plans showed that the foundation of each enclosed, air-conditioned hallway would be connected to the foundation of the side wing to which that hallway was attached.
 

 *519
 
 18. The Plans showed that the foundations for the enclosed, air-conditioned hallways would not be connected to the foundation of the Home's central wing.
 

 19. The Plans showed that each of the three wings would have its own separate foundation and that the foundations for the three wings would not connect together.
 

 20. The Plans showed that the Home would not have a single common foundation.
 

 21. The Plans that were submitted to Currituck County in October 2013 disclosed the square footage of each of the three wings of the Home as well as the total square footage of the Home.
 

 In November of 2013, the Currituck County Planning Director, Mr. Ben E. Woody, issued a Letter of Determination "confirming that the Home as proposed in the Plans would be a single-family detached dwelling and would be permitted on the Lot pursuant to the Currituck County UDO."
 

 Besides approval by the Currituck County BOA, Plaintiff's house required a permit from the N.C. Department of Environment and Natural Resources ("DENR") allowing "[m]ajor [d]evelopment in an [a]rea of [e]nvironmental [c]oncern pursuant to NCGS 113-118[.]" Plaintiff planned to build close to the water, in a location "set back a minimum of 60 feet from the first line of stable natural vegetation[.]" Plaintiff had hired George Wood, of Environmental Professionals, as a consultant to "assist her in obtaining state and federal approvals for construction of a home on the oceanfront property she bought in April 2012." Plaintiff's representatives, including Mr. Wood, her architect, and her contractor, worked with the North Carolina Division of Coastal Management to develop a plan for the house which would meet Coastal Area Management Act ("CAMA") requirements. The requirement which has created most of this controversy was that no building could be larger than 5,000 square feet; Plaintiff planned for the project to be approximately 15,000 square feet.
 

 The trial court's order made several findings of fact regarding the CAMA regulations:
 

 3. Construction on LeTendre's lot would also have to satisfy regulation under
 
 *81
 
 North Carolina's Coastal Area Management Act ("CAMA"). CAMA regulations impose setbacks that developments must satisfy that are based
 
 *520
 
 on the size of the developments proposed. LeTendre wanted her home to use a CAMA setback known as the "60 foot" setback, which requires a development to be set back from the waterfront a minimum of 60 feet or 30 times the property's shoreline erosion rate. That setback is for developments less than 5,000 square feet in size. However, CAMA regulations allow a larger development to use the 60-foot setback if that development is composed of separate components that are each less than 5,000 square feet and that are structurally independent of each other. LeTendre therefore intended to design her home so that each of the three wings would be less than 5,000 square feet and would be structurally independent from each other. Designing homes that are larger than 5,000 square feet so that they have structurally independent components and can use the 60-foot CAMA setback is permitted by the Division of Coastal Management and is common along the North Carolina Coast and in Currituck County. LeTendre's representatives explained to the Division of Coastal Management and to Currituck County her desire for the wings of her home to be structurally independent so that the 60-foot setback could be used.
 

 4. After consultation with the North Carolina Division of Coastal Management, which administers CAMA regulations, and with the Currituck County Planning Department, LeTendre's architect prepared a set of plans that proposed to connect the three wings of her home using uncovered, unenclosed decking. Although this would satisfy CAMA's requirement for structural independence, the Currituck County Planning Director would not accept those plans. The Planning Director determined that connecting the wings with unenclosed decking would not make the wings a single structure in order for the home to qualify as a single-family detached dwelling under the County UDO.
 

 5. During subsequent discussions between LeTendre's design professionals and the County Planning Department, the County Planning Director proposed that the wings be connected with enclosed, air conditioned hallways. The Planning Director determined that connecting the wings in this way would allow the home to qualify as a single-family detached dwelling because
 
 *521
 
 the wings would be sufficiently integrated to constitute a single structure. There was no language in the UDO that expressly contradicted this determination by the Planning Director.
 
 [1]
 

 6. LeTendre's architect therefore prepared a set of plans that proposed to connect the three wings using enclosed, air conditioned hallways. After reviewing these plans, the County Planning Director issued a November 2013 Letter of Determination providing that the home proposed on those plans would qualify as a single-family detached dwelling under the UDO. The Division of Coastal Management also concluded that those plans satisfied CAMA's setback regulations so that the 60-foot setback could be used for LeTendre's home.
 

 After these consultations and plan revisions seeking to comply with both CAMA regulations and the UDO, the CAMA permit was "issued on March 17
 
 th
 
 , 2014, four days after the hearing before the Currituck County Board of Adjustment on March 13, 2014" where Mr. Wood testified as Plaintiff's CAMA expert.
 

 In December of 2013, landowners adjacent to Plaintiff's lot, Mr. and Mrs. Long, appealed the November 2013 Letter of Determination to the Currituck County BOA, which upheld the Letter of Determination in May of 2014. The Longs then sought review of the BOA's determination by the Superior Court, which upheld the BOA's ruling in December of 2014; on 31 December 2014, the Longs appealed.
 

 *82
 
 In March of 2015,
 
 after
 
 the Longs filed their notice of appeal and before the record on appeal had even been submitted to this Court, Plaintiff sought a Building Permit "permitting construction of the Home on the Lot." Our record shows that both the Currituck County Planning Director, Mr. Woody, and counsel for the Longs warned Plaintiff about beginning construction before this Court had issued its opinion in
 
 Long
 
 . On 2 April 2015, counsel for the Longs sent a letter to Plaintiff's counsel warning:
 

 *522
 
 I want to emphasize that this litigation is not over and you and your client are on notice that construction of the project while the litigation is ongoing is done with the risk that the appellate court will reverse the Superior Court, and that such reversal would result in the revocation of the building permit. While it may be true that your client can begin construction (provided there is no other prohibition from the Department of Insurance) your client will nonetheless be required to tear down, dismantle or otherwise remove such construction if the Court of Appeals reverses the Superior Court and revokes the zoning approval and attendant building permit. I understand that your client has elected to proceed with construction despite knowledge of the aforementioned risks.
 

 Despite these warnings, Plaintiff proceeded with construction. Plaintiff described her decision to proceed in her affidavit filed in this case:
 

 14. In March 2015, Currituck County issued a building permit for my home to me and to my general contractor. Although the Longs' appeal wasn't over, after carefully considering all options, I decided to proceed with construction of the home. I made this decision for several reasons.
 

 15. First, over the course of a year, three different authorities had considered the 2013 plans for my home and had agreed that the home would be permitted under the County UDO. The Currituck County Planning Director had made that determination, the Currituck County Board of Adjustment had made that determination, and then a superior court judge had made that determination. All of them had considered the Longs' arguments for why my home shouldn't be allowed, and all of them had rejected the Longs' arguments.
 

 16. Additionally, the plans for my home had been reviewed and approved by a number of other agencies .... These agencies all had reviewed the plans because a CAMA Major Development was required for my home.
 

 17. Meanwhile, the Longs hadn't filed any appeal to the Board of Adjustment from the building permit issued
 
 *523
 
 to me in March 2015. No challenge to that permit existed when I decided to begin construction. In fact, to date, no one has appealed the issuance of my building permit, and the County Building Inspector has never withdrawn that permit. The Longs also had not appealed the Division of Coastal Management's issuance of a CAMA permit for my home.
 

 On 21 June 2016, this Court issued its opinion in
 
 Long
 
 , reversing the superior court's order and holding that Plaintiff's project as proposed was not a single family detached dwelling as defined by the Currituck County UDO, Section 10.51.
 
 See
 

 Long,
 
 --- N.C. App. ----,
 
 787 S.E.2d 835
 
 . Plaintiff alleges in her complaint in this action that construction on the project was about 95% complete at that point. Plaintiff's representatives met with county officials and they discussed various ways of bringing Plaintiff's house into compliance with the UDO in a manner within the CAMA permit but could not reach an agreement. In September 2016, Defendant issued a Stop Work Order. In January 2017, Plaintiff proposed an amendment to the UDO which would allow her project to be permitted as a single family detached dwelling, but the Currituck County Board of Commissioners rejected it. On 1 February 2017, the Currituck County Planning Director issued a Notice of Violation based upon the house's failure to qualify as a single family detached dwelling under the UDO, in accordance with
 
 Long
 
 . Plaintiff made no changes to the house but filed this action seeking injunctions and a declaratory judgment preventing Defendant from complying
 
 *83
 
 with this Court's ruling in
 
 Long
 
 and compensation for Defendant's attempts to enforce
 
 Long
 
 .
 

 III. Preliminary Matters
 

 Before addressing the substance of Defendant's appeal, we first address a few preliminary matters.
 

 A. Plaintiff's Claims
 

 Plaintiff's complaint presents many claims which she alleges support issuance of a preliminary injunction, permanent injunction, and ultimately a declaratory judgment preventing Defendant from enforcing its UDO in accord with this Court's opinion in
 
 Long
 
 . To avoid confusion, we will address Plaintiff's claims mostly in the order as presented in her complaint, although we will group the claims of constitutional violations together since the analysis is similar for each. Plaintiff labeled her claims as follows:
 

 *524
 
 FIRST CAUSE OF ACTION
 

 (Section 10.51 of the Currituck County UDO Violates North Carolina's Zoning Enabling Statutes)
 

 (Section 10.51's Requirement That the Home Have a Single Common Foundation Does Not Promote Health, Safety, Morals, or the General Welfare)
 

 (Section 10.51's Requirement That a Single-Family Detached Dwelling Be Contained Within a Single Building Does Not Promote Health, Safety, Morals, or the General Welfare)
 

 (Section 10.51 Otherwise Imposes Pointless Restrictions)
 

 SECOND CAUSE OF ACTION
 

 (Section 10.51 of the Currituck County UDO Violates the United States and North Carolina Constitutions Because It Is Arbitrary and Capricious)
 

 THIRD CAUSE OF ACTION
 

 (Section 10.51 of the Currituck County UDO Attempts To Regulate "Building Design Elements" In Violation of North Carolina Law)
 

 FOURTH CAUSE OF ACTION
 

 (Section 10.51 of the Currituck County UDO Is Preempted By the North Carolina Building Code)
 

 FIFTH CAUSE OF ACTION
 

 (Section 10.51 of the Currituck County UDO Is Unconstitutionally Vague)
 

 SIXTH CAUSE OF ACTION
 

 (Currituck County Has Taken LeTendre's Property)
 

 SEVENTH CAUSE OF ACTION
 

 (Currituck County Has Violated LeTendre's Right to Equal Protection Under the North Carolina Constitution and the United States Constitution)
 

 EIGHTH CAUSE OF ACTION
 

 (Currituck County's Attempts to Enforce Section 10.51 of the UDO Against the Home are Barred by Laches)
 

 *525
 
 NINTH CAUSE OF ACTION
 

 (LeTendre Has Vested Rights To Complete the Home and To Use the Home)
 
 [2]
 

 In this appeal, we will consider
 
 only
 
 whether the trial court erred in issuing the preliminary injunction. We will consider only whether the trial court erred in issuing the preliminary injunction based upon the conclusion that Plaintiff is likely to prevail on the merits of any of the other claims and will suffer irreparable harm without issuance of the injunction.
 

 B. Interlocutory Appeal
 

 Because the preliminary injunction is not a final order, this appeal is interlocutory.
 
 See
 

 Rockford-Cohen Grp., LLC v. N.C. Dep't of Ins.
 
 ,
 
 230 N.C. App. 317
 
 , 318,
 
 749 S.E.2d 469
 
 , 471 (2013) ("It is well-established that a preliminary injunction is an interlocutory order.") "There is no immediate right of appeal from an interlocutory order unless the order affects a substantial right."
 

 Id.
 

 Defendant alleges that it has a substantial right that will be impaired if review is delayed because it has a right to exercise its police power to enforce its ordinances. Defendant is correct as clarified by Judge, now Justice, Ervin's dissent, which was adopted by the Supreme Court in
 
 *84
 

 Sandhill Amusements, Inc. v. Sheriff of Onslow Cnty.
 
 : "[T]his Court has recognized that the entry of a preliminary injunction precluding a state or local agency from enforcing the law affects a substantial right and is immediately appealable."
 
 236 N.C. App. 340
 
 , 360,
 
 762 S.E.2d 666
 
 , 680 (2014) (Ervin, J. dissenting),
 
 rev'd and remanded
 
 ,
 
 368 N.C. 91
 
 ,
 
 773 S.E.2d 55
 
 (2015). Adoption and enforcement of zoning ordinances is an exercise of the police power.
 
 See
 

 Raleigh v. Fisher
 
 ,
 
 232 N.C. 629
 
 , 635,
 
 61 S.E.2d 897
 
 , 902 (1950) ("In enacting and enforcing zoning regulations, a municipality acts as a governmental agency and exercises the police power of the State.") This Court therefore "has jurisdiction over Defendant's appeal from the issuance of the preliminary injunction" and we will "proceed to address the validity of Defendant's challenge to ... the trial court's order on the merits."
 
 Sandhill
 
 ,
 
 236 N.C. App. at 361
 
 ,
 
 762 S.E.2d at 681
 
 .
 

 C. Plaintiff's Motion to Dismiss as Moot
 

 Plaintiff has moved to dismiss this appeal as moot because the preliminary injunction on appeal allowed her to complete the construction
 
 *526
 
 of the project and begin using it. Plaintiff argues that the "[c]onstruction cannot be undone, the County's determination that the Home was constructed in accordance with the building code cannot be unmade, and the [Certificate of Occupancy] cannot rightfully be rescinded." Defendant responds that even though the project is complete, the preliminary injunction continues to have effect because it "prevents the County from requiring Letendre to cease use of the multiple buildings on her property until she complies with the UDO and this Court's
 
 Long
 
 decision and the County's use of civil and criminal remedies to enforce the county's ordinance."
 

 "A case is considered moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy."
 
 Lange v. Lange
 
 ,
 
 357 N.C. 645
 
 , 647,
 
 588 S.E.2d 877
 
 , 879 (2003) (citation and quotation marks omitted). Plaintiff's assertions that "construction cannot be undone" and "the [Certificate of Occupancy] cannot rightfully be rescinded" are not supported by law and are incorrect. Construction can be undone and structures can be moved. Plaintiff's assertion regarding "the County's determination that the Home was constructed in accordance with the building code" is irrelevant. There has never been any contention in this case that Plaintiff's project was in violation of the building code; the dispute arises from the UDO. Because the preliminary injunction continues to keep Defendant from enforcing the UDO as required by this Court's opinion in
 
 Long
 
 , this appeal is not moot,
 
 see generally
 

 id.
 

 , and Plaintiff's motion to dismiss is denied.
 

 IV. Analysis
 

 Defendant appealed the trial court's ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION which orders Defendant to "deem the home approved by the building permit issued in March 2015 to be a single-family detached dwelling for purposes of the Currituck County Unified Development Ordinance" and to allow Plaintiff to complete construction of the home and to grant a certificate of occupancy when complete. The trial court determined Plaintiff was likely to succeed on the merits of several claims in her complaint, and Plaintiff argues on appeal that even if a legal basis found by the trial court was in error, the order must be affirmed if there is any legal basis to support the result. Therefore, if just one of Plaintiff's claims is likely to succeed on the merits, the injunction must be affirmed.
 
 See generally
 

 Shore v. Brown
 
 ,
 
 324 N.C. 427
 
 , 428,
 
 378 S.E.2d 778
 
 , 779 (1989) ("If the correct result has been reached, the judgment will not be disturbed even though the trial court may not have assigned the correct reason for the
 
 *527
 
 judgment entered.") Because we have determined that Plaintiff is not likely to succeed on any of her claims, we must address each of them.
 

 A. Standard of Review
 

 In review of a trial court's ruling on a motion for a preliminary injunction, we begin with the "presumption that the lower court's decision was correct, and the burden is on the appellant to show error."
 
 A.E.P. Industries v. McClure
 
 ,
 
 308 N.C. 393
 
 , 414,
 
 302 S.E.2d 754
 
 , 767 (1983). But "on appeal from
 
 *85
 
 an order of superior court granting or denying a preliminary injunction, an appellate court is not bound by the findings, but may review and weigh the evidence and find facts for itself."
 
 Id.
 
 at 402,
 
 302 S.E.2d at 760
 
 . "The scope of appellate review in the granting or denying of a preliminary injunction is essentially
 
 de novo
 
 ."
 
 Robins & Weill v. Mason
 
 ,
 
 70 N.C. App. 537
 
 , 540,
 
 320 S.E.2d 693
 
 , 696 (1984).
 

 A preliminary injunction is an extraordinary measure normally intended only to preserve the status quo during litigation,
 

 [i]t will be issued only (1) if a plaintiff is able to show likelihood of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation.
 

 A.E.P.
 
 ,
 
 308 N.C. at 401
 
 ,
 
 302 S.E.2d at 759-60
 
 (citations omitted).
 

 In this action, there is no challenge to the trial court's underlying findings of fact. Also, the preliminary injunction was not intended "to preserve the status quo[,]"
 
 see
 

 id.
 

 , but to change it, by requiring Defendant to disregard the UDO's plain language as interpreted by
 
 Long
 
 and remove Defendant's ability to enforce the law.
 
 See generally
 

 Long
 
 , --- N.C. App. ----,
 
 787 S.E.2d 835
 
 . But in any event, the first question in determining whether a preliminary injunction should have been granted is the likelihood of success on the merits.
 
 See
 
 id.
 

 If the Plaintiff is unable to show likelihood of success on the merits of her legal claims, the Court need not reach the second question of whether the Plaintiff "is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation."
 

 Id.
 

 We will next consider whether Defendant has met its burden of showing that Plaintiff does not have a likelihood of success on the merits for each claim. Defendant's brief addresses why Plaintiff's claims will likely not succeed, and Plaintiff's brief addresses why they will.
 

 *528
 
 Thus, while Defendant is the appellant, the focus of our analysis is on Plaintiff's claims and their "likelihood of success on the merits[.]"
 

 Id.
 

 We consider "essentially
 
 de novo
 
 [,]"
 
 Robins
 
 ,
 
 70 N.C. App. at 540
 
 ,
 
 320 S.E.2d at 696
 
 , whether the trial court erred in taking this "extraordinary measure" and determining "plaintiff is able to show likelihood of success on the merits[.]"
 
 A.E.P.
 
 ,
 
 308 N.C. at 401
 
 ,
 
 302 S.E.2d at 759
 
 . Because many of Plaintiff's claims are similar and her arguments tend to overlap, and because Plaintiff's brief does not address the issues in the same order as Defendant's brief, we will address the claims in the order as set forth in the complaint.
 

 We also note that while Plaintiff has presented nine claims, including constitutional claims, Plaintiff is actually challenging a
 
 definition
 
 of a single family detached dwelling. Six out of Plaintiff's nine claim headings specifically reference Section 10.51 and the other three implicitly rely upon it. As noted by
 
 Long
 
 , Section 10.51 simply defines a single family detached dwelling as "[a] residential building containing not more than one dwelling unit to be occupied by one family, not physically attached to any other principal structure. UDO § 10.51."
 
 Long
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 838
 
 . While it is easy to lose the forest for the trees amidst Plaintiff's many claims, Plaintiff is simply challenging the definition of a single family detached dwelling as interpreted by
 
 Long
 
 and as applied to her project.
 
 See
 

 Id.
 

 --- N.C. App. ----,
 
 787 S.E.2d 835
 
 .
 

 B. Claim I: UDO Section 10.51 Violates North Carolina's Zoning Enabling Statutes
 

 Plaintiff raises two claims under the Zoning Enabling Statutes.
 

 1. North Carolina General Statute § 153A-340(a)
 

 Plaintiff alleges that Section 10.51 of the UDO violates North Carolina General Statute § 153A-340(a), which is the grant of power to counties to enact zoning ordinances:
 

 For the purpose of promoting health, safety, morals, or the general welfare, a county may adopt zoning and development regulation ordinances. These ordinances may be
 
 *86
 
 adopted as part of a unified development ordinance or as a separate ordinance. A zoning ordinance may regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lots that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and
 
 *529
 
 use of buildings, structures, and land for trade, industry, residence, or other purposes.
 

 N.C. Gen. Stat. § 153A-340(a) (2017).
 

 The trial court made this conclusion of law on the zoning enabling statute:
 

 4. LeTendre is likely to prevail on her claim that the provisions of the UDO that are barring her home from being a single-family detached dwelling are unenforceable because
 
 those provisions violate the zoning enabling statutes.
 
 They constitute an arbitrary restriction on her ability to use her property in that they do not promote health, safety, morals, or the general welfare.
 

 (Emphasis added.) Plaintiff contends that Section 10.51 of Currituck County's UDO violates North Carolina General Statute § 153A-340(a) because it does not promote "health, safety, morals, or the general welfare[.]"
 

 Id.
 

 Plaintiff argues that Section 10.51's "requirements" of "a Single Common Foundation" and "that a Single-Family Detached Dwelling Be Contained Within a Single Building" do not "Promote Health, Safety, Morals, or the General Welfare[.]"
 

 "The presumption is that the zoning ordinance as a whole is a proper exercise of the police power[.] The burden to show otherwise rests upon a property owner who asserts its invalidity."
 
 Durham County. v. Addison
 
 ,
 
 262 N.C. 280
 
 , 282,
 
 136 S.E.2d 600
 
 , 602 (1964) (citations, quotation marks, and ellipses omitted). In asserting Section 10.51's "invalidity[,]"
 
 see
 

 id.
 

 , Plaintiff focuses on her alleged "requirements" of UDO Section 10.51 and the lack of a substantial relation between the regulation and the promotion of general welfare. Plaintiff argues,
 

 Our courts have confirmed that zoning regulations are valid only if they substantially promote one of the four stated goals. 'Zoning ordinances are upheld when, but only when, they bear a
 

 substantial relation
 

 to the public health, safety, morals, or general welfare.'
 
 Schloss v. Jamison
 
 ,
 
 262 N.C. 108
 
 , 114,
 
 136 S.E.2d 691
 
 , 695 (1964) (emphasis added);
 
 see also
 

 Covington v. Town of Apex
 
 ,
 
 108 N.C. App. 231
 
 , 234-35,
 
 423 S.E.2d 537
 
 , 539 (1992) (striking down a town's rezoning ordinance in part because the rezoning would create only aesthetic improvements, which were a minimal public benefit);
 
 Wenco Mgmt. Co.
 
 [
 
 v.
 
 ]
 
 Town of Carrboro
 
 ,
 
 53 N.C. App. 480
 
 ,
 
 281 S.E.2d 74
 
 (1981)
 

 *530
 
 (finding zoning ordinances that barred drive-thru restaurants but allowed other types of businesses to have drive-thru windows as not being reasonably related to any legitimate governmental objective).
 

 (Emphasis in original.) Plaintiff claims, and the trial court found, that Section 10.51 of the UDO is an "arbitrary restriction on her ability to use her property" because it does "not promote health, safety, morals, or the general welfare" so it is in violation of the zoning enabling statutes. Plaintiff argues that "the UDO's requirement of structural dependence does not bear substantial relation to the zoning enabling statute because this statute does not authorize a County to regulate the design or function of structural elements."
 

 The most basic problem with Plaintiff's argument is that UDO Section 10.51 does
 
 not
 
 require "a Single Common Foundation" or that "a Single-Family Detached Dwelling Be Contained Within a Single Building[,]" nor does it "regulate the design or function of structural elements." As explained in
 
 Long
 
 ,
 

 The UDO defines "DWELLING, SINGLE-FAMILY DETACHED" as follows: "A residential building containing not more than one dwelling unit to be occupied by one family, not physically attached to any other principal structure." UDO § 10.51. Thus, the definition of a Single Family Dwelling has five elements: (1) A building, (2) for residential use, (3) containing not more than one dwelling unit, (4) to be occupied by one family, and (5) not physically attached to any other "principal structure." The definition of a Single Family Dwelling includes portions that address the physical structure of the proposed
 
 *87
 
 dwelling: "a building," "containing not more than one dwelling unit," and "not physically attached to any other principal structure." ...
 

 ....
 

 Yet the definition of Single Family Dwelling clearly allows more than one "building" or "structure" to be constructed on the same lot, so the presence of three "buildings" alone does not disqualify the project.
 

 --- N.C. App. at ----,
 
 787 S.E.2d at 838-40
 
 (citation and footnotes omitted).
 

 Plaintiff argues because the UDO would allow a 15,000 square foot house on Plaintiff's lot there is no practical difference between her
 
 *531
 
 project and a 15,000 square foot house of a more traditional configuration. Plaintiff's argument, and some of the trial court's findings, also focus on a "structural dependence" requirement allegedly imposed by Defendant. But the UDO does not address structural dependency nor does it require any particular type or design of foundation. The type or design of foundation was also not a factor in this Court's decision in
 
 Long
 
 .
 
 See
 

 Long
 
 , --- N.C. App. ----,
 
 787 S.E.2d 835
 
 . Section 10.51 addresses the types of structures allowed but says nothing about their construction or design.
 
 See generally
 

 id.
 

 at ----,
 
 787 S.E.2d at 838
 
 . Section 10.51 is directly within the types of restrictions listed by North Carolina General Statute § 153A-340(a) ; Defendant
 

 may regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lots that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures, and land for trade, industry, residence, or other purposes.
 

 N.C. Gen. Stat. § 153A-340(a). Plaintiff's focus on a requirement of "structural dependence" is simply misplaced.
 

 The only specific requirements as to the design or size of the house or type of foundation are imposed by the CAMA permit which will not allow any single building to be over 5,000 square feet. As the trial court found, "CAMA regulations allow a larger development to use the 60-foot setback if that development is composed of
 
 separate components that are each less than 5,000 square feet
 
 and that are
 
 structurally independent of each other
 
 ." (Emphasis added). And the need for a CAMA permit was created by Plaintiff's decision to build the house so close to the shore. Plaintiff's lot is approximately 3.5 acres, and the project could have been constructed in another location where a CAMA permit would not be needed. The unique characteristics of Plaintiff's lot and her desired project location do not mean that Defendant acted beyond the authority granted by North Carolina General Statute § 153A-340(a) to enact ordinances which in their legislative judgment "promote health, safety, morals, or the general welfare[.]" N.C. Gen. Stat. § 153A-340(a).
 

 In addition,
 
 Long
 
 also noted the substantial relation between Section 10.51 and the general welfare:
 

 *532
 
 The UDO provides that the SF District
 

 is established to accommodate very low density residential development on the portion of the outer banks north of Currituck Milepost 13. The district is intended to accommodate limited amounts of development in a manner that preserves sensitive natural resources, protects wildlife habitat, recognizes the inherent limitations on development due to the lack of infrastructure, and seeks to minimize damage from flooding and catastrophic weather events. The district accommodates single-family detached homes. Public safety and utility uses are allowed, while commercial, office, and industrial uses are prohibited.
 

 Long
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 838
 
 (citation, ellipses, and brackets omitted). "The UDO defines DWELLING, SINGLE-FAMILY DETACHED as follows: A residential building containing not more than one dwelling unit to be occupied by one family, not physically attached to any other principal structure. UDO § 10.51."
 

 Id.
 

 at ----,
 
 787 S.E.2d at 838
 
 (quotation marks omitted). Thus, allowing only residential buildings that do not contain "more than one dwelling unit to be occupied by one family" and are "not physically attached to any other principal
 
 *88
 
 structure" ensures there is "limited amounts of development in a manner that preserves sensitive natural resources, protects wildlife habitat, recognizes the inherent limitations on development due to the lack of infrastructure, and seeks to minimize damage from flooding and catastrophic weather events[;]"
 

 id.
 

 , the UDO's goals would promote "the public health, safety, morals, or general welfare." N.C. Gen. Stat. § 153A-340(a). And while we find Plaintiff's argument to be without merit, even assuming
 
 arguendo
 
 there was weight to her contention that UDO Section 10.51 does not promote "public health, safety, morals, or general welfare[,]" Plaintiff's own cited case law states that
 

 [w]hen the most that can be said against such ordinances is that whether it was an unreasonable, arbitrary or unequal exercise of power is fairly debatable, the courts will not interfere. In such circumstances the settled rule seems to be that the court will not substitute its judgment for that of the legislative body charged with the primary
 
 *533
 
 duty and responsibility of determining whether its action is in the interest of the public health, safety, morals or general welfare.
 

 Schloss v. Jamison
 
 ,
 
 262 N.C. 108
 
 , 115,
 
 136 S.E.2d 691
 
 , 696 (1964) (citations and quotation marks omitted).
 

 Plaintiff is asking this Court to conclude she is likely to prevail on a claim that a UDO
 
 definition
 
 of a single family detached dwelling is beyond the legislative authority granted by North Carolina General Statute § 153A-340(a). If we were to determine that Plaintiff is likely to prevail on such a claim, our ruling would cast serious doubt on nearly every common provision of all municipal ordinances in the State of North Carolina, including definitions of single family detached dwellings and other common uses. Plaintiff has presented no authority that Defendant's definition of a single family detached dwelling is beyond the County's statutory power. Plaintiff is unlikely to prevail on her claim that UDO Section 10.51 is not authorized by North Carolina General Statute § 153A-340(a), and thus that is not a proper basis for a preliminary injunction.
 

 2. North Carolina General Statute § 153A-340(l)
 

 North Carolina General Statute § 153A-340(l) provides, in part,
 

 Any zoning and development regulation ordinance relating to building design elements adopted under this Part, under Part 2 of this Article, or under any recommendation made under G.S. 160A-452(6) c. may not be applied to any structures subject to regulation under the North Carolina Residential Code for One- and Two-Family Dwellings ....
 

 ....
 

 ... For the purposes of this subsection, the phrase "building design elements" means exterior building color; type or style of exterior cladding material; style or materials of roof structures or porches; exterior nonstructural architectural ornamentation; location or architectural styling of windows and doors, including garage doors; the number and types of rooms; and the interior layout of rooms. The phrase "building design elements" does not include any of the following: (i) the height, bulk, orientation, or location of a structure on a zoning lot; (ii) the use of buffering or screening to minimize visual impacts, to mitigate the impacts of light and noise, or to protect the privacy of
 
 *534
 
 neighbors; or (iii) regulations adopted pursuant to this Article governing the permitted uses of land or structures subject to the North Carolina Residential Code for One-and Two-Family Dwellings.
 

 N.C. Gen. Stat. § 153A-340(l) (2017).
 

 Plaintiff also argues that "Section 10.51 of the Currituck County UDO [a]ttempts [t]o [r]egulate "[b]uilding [d]esign [e]lements" [i]n [v]iolation of North Carolina [l]aw[,]" specifically North Carolina General Statute § 153A-340(l). Plaintiff essentially alleges in her complaint that because multiple principal structures are not allowed on her lot, the UDO impermissibly attempts "to regulate the interior layout of rooms[.]" The trial court did not make a specific conclusion as to North Carolina General Statute § 153A-340(l) and its conclusion regarding the zoning enabling statute focuses on the "public welfare" portion of subsection (a).
 

 *89
 
 Plaintiff also does not make any arguments specifically regarding North Carolina General Statute § 153A-340(l) in her brief.
 

 But just as we discussed above, Plaintiff's argument seeks to impose imaginary "requirements" upon Section 10.51. Section 10.51 does not address the "interior layout of rooms" any more than it addresses foundations or "structural dependence[.]" Plaintiff is unlikely to prevail on a claim that Defendant wrongfully regulated the interior layout of her rooms, and thus that could not be a proper basis for a preliminary injunction.
 

 C. Constitutional Claims
 

 Plaintiff's second, fifth, and seventh claims all raise constitutional issues. Each of the constitutional issues again focuses on Section 10.51. It is not entirely clear if Plaintiff's claims are facial or as-applied challenges to Section 10.51.
 

 [T]here is a difference between a challenge to the facial validity of an ordinance as opposed to a challenge to the ordinance as applied to a specific party. The basic distinction is that an as-applied challenge represents a plaintiff's protest against how a statute was applied in the particular context in which plaintiff acted or proposed to act, while a facial challenge represents a plaintiff's contention that a statute is incapable of constitutional application in any context. In an as-applied case, the plaintiff is contending that the defendant municipal agency violated his or her constitutional rights in the manner in which an ordinance was applied to his or her property. Only in as-applied
 
 *535
 
 challenges are facts surrounding the plaintiff's particular circumstances relevant.
 

 ... And in the context of a zoning action involving property, it must be clear that the state's action has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense. Further, in making this determination we may consider, among other factors, whether: (1) the zoning decision is tainted with fundamental procedural irregularity; (2) the action is targeted at a single party; and (3) the action deviates from or is inconsistent with regular practice.
 

 Town of Beech Mountain v. Genesis Wildlife
 
 ,
 
 247 N.C. App. 444
 
 , ----,
 
 786 S.E.2d 335
 
 , 347 (2016) (citations, quotation marks, and brackets omitted),
 
 aff'd per curiam
 
 ,
 
 369 N.C. 722
 
 ,
 
 799 S.E.2d 611
 
 (2017). The complaint uses the phrase "on its face" several times, but Plaintiff cites no authority and makes no real argument that the UDO is unconstitutional on its face. Because "a facial challenge represents a Plaintiff's contention that a statute is incapable of constitutional application
 
 in any context
 
 [,]" if we determine the ordinance is constitutional as-applied to Plaintiff, we have necessarily also determined it is facially constitutional as her case is the "context" where it is capable "of constitutional application[.]"
 

 Id.
 

 (emphasis added). Plaintiff's real argument is that UDO Section 10.5 is unconstitutional as applied to her project, so we will address her contentions accordingly.
 

 Again, it is also important to remember the history of this case. Defendant initially approved Plaintiff's plans and the Longs challenged that approval in
 
 Long
 
 .
 
 See generally
 

 Long
 
 , --- N.C. App. ----,
 
 787 S.E.2d 835
 
 . Defendant did not
 
 apply
 
 UDO Section 10.51 to Plaintiff in the manner she claims to be unconstitutional in this case until after
 
 Long
 
 was issued and Defendant sought to comply with the ruling in
 
 Long
 
 . So Plaintiff's as-applied constitutional challenges are based upon Defendant's efforts to enforce the UDO as interpreted by
 
 Long
 
 .
 

 While our standard of review remains "essentially
 
 de novo
 
 [,]"
 
 Robins
 
 ,
 
 70 N.C. App. at 540
 
 ,
 
 320 S.E.2d at 696
 
 , for purposes of whether the trial court should have issued a preliminary injunction, we also consider constitutional issues
 
 de novo
 
 :
 

 The standard of review for questions concerning constitutional rights is
 
 de novo
 
 . Furthermore, when considering
 
 *536
 
 the constitutionality of a statute or act there is a presumption in favor of constitutionality, and all doubts must be resolved in favor of the act. In passing upon the constitutionality of a statute there is a presumption that
 
 *90
 
 it is constitutional, and it must be so held by the courts, unless it is in conflict with some constitutional provision.
 

 State v. Fryou
 
 ,
 
 244 N.C. App. 112
 
 , 125,
 
 780 S.E.2d 152
 
 , 161 (2015),
 
 disc. review dismissed
 
 ,
 
 368 N.C. 689
 
 ,
 
 781 S.E.2d 479
 
 ,
 
 disc. review denied
 
 ,
 
 368 N.C. 689
 
 ,
 
 781 S.E.2d 483
 
 (2016).
 

 1. Arbitrary and Capricious
 

 Plaintiff argues that application of Section 10.51 violates the state and federal constitutions because it arbitrarily and capriciously distinguishes between building characteristics and her constitutional due process rights have been violated. To a large extent, Plaintiff's argument repeats her contentions from her arguments regarding North Carolina General Statute § 153A-340(a). The trial court's only conclusion which appears to address this claim is: "They constitute an arbitrary restriction on her ability to use her property in that they do not promote health, safety, morals, or the general welfare."
 
 [3]
 

 Plaintiff contends
 

 Section 10.51 violates the federal and state constitutions because it is arbitrary and capricious in three respects: (1) its distinction of permissible buildings based on common, versus separate, foundations; (2) its requirement that a 'dwelling' be a single building; and (3) the County's interpretation that labeling within plans as opposed to actual building characteristics, is determinative.
 

 Plaintiff only cites one case in this section of her brief: " 'Governmental action in the zoning or land use context violates due process principles if it is arbitrary or capricious, lacks a rational basis, or is undertaken with improper motives.'
 
 Browning-Ferris Industs. Of South Atlantic, Inc. v. Wake Cty.
 
 ,
 
 905 F.Supp. 312
 
 , 319 (E.D.N.C. 1995)."
 
 [4]
 
 Plaintiff uses
 
 Browning-Ferris
 
 only to support this general proposition, which is
 
 *537
 
 correct, but Plaintiff cites no cases to show how her enumerated three contentions would likely violate her rights to due process.
 

 In
 
 Responsible Citizens
 
 , our Supreme Court set out the analysis to be used in "due process challenges to governmental regulations of private property claimed to be an invalid exercise of the police power."
 
 See generally
 

 Responsible Citizens v. City of Asheville,
 

 308 N.C. 255
 
 , 261,
 
 302 S.E.2d 204
 
 , 208 (1983).
 

 Several principles must be borne in mind when considering a due process challenge to governmental regulation of private property on grounds that it is an invalid exercise of the police power. First, is the object of the legislation within the scope of the police power? Second, considering all the surrounding circumstances and particular facts of the case is the means by which the governmental entity has chosen to regulate reasonable?
 

 In short, then, the court is to engage in an ends-means analysis in deciding whether a particular exercise of the police power is legitimate. The court first determines whether the ends sought,
 
 i.e.
 
 , the object of the legislation, is within the scope of the power. The court then determines whether the means chosen to regulate are reasonable. Justice Brock stated that this second inquiry is really a two-pronged test. That is, in determining if the means chosen are reasonable the court must answer the following: (1) Is the statute in its application reasonably necessary to promote the accomplishment of a public good and (2) is the interference with the owner's right to use his property as he deems appropriate reasonable in degree?
 

 Id.
 

 at 255, 261-62
 
 , 302 S.E.2d at 208 (citations and quotation marks omitted).
 

 As directed by our Supreme Court in
 
 Responsible Citizens
 
 ,
 
 see
 

 id.
 
 , we must first consider whether "the object of the ordinance is within the scope of the police
 
 *91
 
 power[.]"
 
 Id
 
 . at 261,
 
 302 S.E.2d at 208
 
 . It is well-established that zoning ordinances such as Section 10.51 are within Defendant's police power:
 

 In enacting and enforcing zoning regulations, a municipality acts as a governmental agency and exercises the police power of the State. The police power is that
 
 *538
 
 inherent and plenary power in the state which enables it to govern, and to prohibit things hurtful to the health, morals, safety, and welfare of society.
 

 Raleigh v. Fisher
 
 ,
 
 232 N.C. 629
 
 , 635,
 
 61 S.E.2d 897
 
 , 902 (1950). In addition, Section 10.51 is specifically within the authority granted by North Carolina General Statute § 153A-340(a).
 
 See
 
 N.C. Gen. Stat. § 153A-340(a).
 

 Next, we must address whether "considering all the surrounding circumstances and particular facts of the case is the means by which the governmental entity has chosen to regulate reasonable?"
 
 Responsible Citizens
 
 , 308 N.C. at 261, 302 S.E.2d at 208. This question includes a "two-pronged test": "(1) Is the statute in its application reasonably necessary to promote the accomplishment of a public good and (2) is the interference with the owner's right to use his property as he deems appropriate reasonable in degree?"
 
 Id.
 
 at 261-62, 302 S.E.2d at 208.
 

 The first question is whether Section 10.51 of the UDO is "in its application reasonably necessary to promote the accomplishment of a public good[.]"
 
 Id.
 
 Defendant has chosen to adopt a zoning ordinance which limits development in the Single Family Residential Outer Banks Remote District.
 
 See generally
 

 Long,
 
 --- N.C. App. at ----,
 
 787 S.E.2d at 838
 
 . The "public good" which the ordinance seeks to accomplish is provided by the ordinance itself:
 

 The UDO provides that the [Single Family Residential Outer Banks Remote] District
 

 is established to accommodate very low density residential development on the portion of the outer banks north of Currituck Milepost 13. The district is intended to accommodate limited amounts of development in a manner that preserves sensitive natural resources, protects wildlife habitat, recognizes the inherent limitations on development due to the lack of infrastructure, and seeks to minimize damage from flooding and catastrophic weather events. The district accommodates single-family detached homes. Public safety and utility uses are allowed, while commercial, office, and industrial uses are prohibited.
 

 Id.
 

 Part of the "surrounding circumstances[,]"
 
 Responsible Citizens
 
 , 308 N.C. at 261, 302 S.E.2d at 208, is the natural environment of the
 
 *539
 
 Single Family Residential Outer Banks Remote District. The location of Plaintiff's project is so environmentally sensitive that her house also required a CAMA permit and approval by other agencies. Plaintiff's project is in exactly the type of location which justifies limitations on development. The limitations are intended both to protect the natural environment
 
 and
 
 to protect the people who live in or visit the area. As the UDO notes, there is a "lack of infrastructure," making access by emergency personnel more difficult.
 
 See generally
 

 Long
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 838
 
 . In addition, the area is subject to "flooding and catastrophic weather events" so there is a greater risk of a need for emergency evacuation.
 

 Id.
 

 The risk from flooding and erosion is also one of the stated reasons for the structural limitations of the CAMA permit: "Any structure authorized by this permit shall be relocated or dismantled when it becomes imminently threatened by changes in shoreline configuration." Plaintiff's environmental expert, Mr. Woody, described the reasons for the 5,000 square foot limitation in his affidavit:
 

 The goal in determining structure setbacks under CAMA is articulated in a January 17, 1992 memorandum to the Implementation & Standards Committee (CRAC) from Charles Jones of the DCM staff. That memorandum states that the "
 
 objective [of determining the size of a structure] is to limit the total size of a structure so that it can be readily relocated if threatened by erosion." If a home is larger than 5,000 square feet but consists of structurally independent
 

 *92
 

 components that are each less than 5,000 square feet, that would facilitate relocation of the structure if it is threatened by erosion.
 

 (Emphasis added.)
 

 Defendant's ordinances are "reasonably necessary to promote the accomplishment of a public good" and Defendant is applying them reasonably and consistently with that purpose. "[I]t is this Court's duty to apply the ordinance irrespective of any opinion we may have as to its wisdom, for it is our duty to declare what the law is not what the law ought to be."
 
 Town of Pine Knoll Shores v. Evans
 
 ,
 
 104 N.C. App. 79
 
 , 83,
 
 407 S.E.2d 895
 
 , 897 (1991) (citation, quotation marks, and brackets omitted),
 
 aff'd as modified
 
 ,
 
 331 N.C. 361
 
 ,
 
 416 S.E.2d 4
 
 (1992). Although there may be other ways to accomplish the UDO's purposes and it could be worded differently, we cannot substitute our judgment for that of the
 
 *540
 
 Currituck County Board of Commissioners.
 
 [5]
 

 See
 
 id.
 

 The specific application of Section 10.51 of the UDO to Plaintiff's project which Plaintiff challenges is based upon Defendant's Notice of Violation and Stop Work order issued after, and based directly upon, this Court's opinion in
 
 Long
 
 . Plaintiff cannot show that Defendant has acted unreasonably or arbitrarily by seeking to comply with this Court's mandate.
 
 See
 

 Battle v. City of Rocky Mount
 
 ,
 
 156 N.C. 329
 
 , 337,
 
 72 S.E. 354
 
 , 357 (1911) ("The law will not countenance or condone any attempt to defy its mandate. The private citizen must obey the law, and the public officer is not exempt from this duty by any special privilege appertaining to his office. He is not wiser than the law, nor is he above it.")
 

 The second prong of the test "is [whether] the interference with the owner's right to use his property as he deems appropriate [is] reasonable in degree?"
 
 Responsible Citizens
 
 , 308 N.C. at 255, 262, 302 S.E.2d at 208. In
 
 Wenco Management Co. v. Town of Carrboro
 
 , this Court addressed whether a zoning ordinance was a reasonable interference with the landowner's right to use its property.
 
 53 N.C. App. 480
 
 ,
 
 281 S.E.2d 74
 
 (1981). Carrboro had adopted an amendment to its zoning ordinances which barred drive-through windows for restaurants in all of the business zoning districts in town except one, the B-4 district.
 
 See
 

 id.
 
 at 482,
 
 281 S.E.2d at 75
 
 . But Carrboro designated no area in the town as B-4, so there was nowhere in town where
 
 Wenco
 
 could operate a restaurant with drive-through service.
 
 See
 
 id.
 

 In addition, Carrboro had adopted the amendment to its zoning ordinance "in direct response to plaintiffs' proposed construction of a restaurant with drive-in service after plaintiffs had obtained a valid conditional use permit."
 
 Id.
 
 at 483,
 
 281 S.E.2d at 76
 
 . This Court determined the amendment was not reasonably related to any legitimate governmental interest because of the timing of the ordinance in response to plaintiff's permit and the fact that no area was designated as a B-4 district, holding that "[t]he B-4 district amendment was unlawful as an arbitrary and unduly discriminatory interference with plaintiffs' property rights which lacked any rational relation to valid police power objectives."
 
 Id.
 
 at 484,
 
 281 S.E.2d at 76
 
 .
 

 Here, there is no indication that Defendant has adopted or applied any zoning ordinance in a discriminatory, arbitrary, or retaliatory manner. Nor does the ordinance prevent Plaintiff from using her lot for its intended purpose, a single family detached dwelling. The UDO does not limit plaintiff's right to build a house on her property; it does not limit
 
 *541
 
 the square footage of the house, or as relevant for this case, where on the lot she may build. Once again, plaintiff's issue is created by a combination of her decision to build in a certain location on her property, the CAMA permit based upon that location, and the requirements of the UDO. Any "interference with [Plaintiff's] right to use her property as [she] deems appropriate" imposed by the UDO is secondary to the other factors and is "reasonable in degree[.]"
 
 Responsible Citizens,
 

 308 N.C. at 262
 
 , 302 S.E.2d at 208.
 

 Plaintiff also argues that the UDO is arbitrary and capricious as applied to her because
 
 *93
 
 of (1) a distinction of permissible buildings based on common versus separate foundations; (2) a requirement that a dwelling be a single building; and (3) Defendant's interpretation that labeling within the plans, as opposed to actual building characteristics, is determinative.
 

 Plaintiff's argument regarding the foundation of the project is based primarily upon the Letter of Determination from the Planning Director, of 27 March 2017. In that letter, Mr. Woody stated:
 

 In response to the Notice of Violation dated February 1, 2017, you have submitted for review construction plans dated January 20, 2017. The construction plans dated January 20, 2017 depict the same three structurally separate and independent buildings illustrated on construction plans dated November 22, 2013 that were the subject of the Letter of Determination reversed by the Court of Appeals. Other than modification of language on the construction plan sheets, there appears to be no material difference between the plans used to construct the three structurally separate and independent buildings and the construction plans dated January 20, 2017. It is also noteworthy that to acquire a permit from the North Carolina Division of Coastal Management it is represented to that agency that the buildings located on your property are structurally separate and independent buildings. In a January 27, 2017 North Carolina Division of Coastal Management memorandum from Doug Hugget, Major Permits Coordinator, to Ron Reinaldi, Field Representative, Mr. Hugget writes, "The original major permit authorized the construction of three single-family dwellings connected via a structurally detached roofed two story deck ...." Mr. Hugget's memorandum further shows that the only changes on construction plan sheets
 
 *542
 
 are (1) "[c]hanges nomenclature on the Title Sheet to refer to the dwelling as a 'Single-Family Dwelling' " and "depicts a smaller constructed size of the permitted gazebo building" and (2) "that a girder system that would connect the separate buildings is no longer being considered and is not incorporated into the submitted construction plans."
 

 The February 1, 2017 Notice of Violation requires compliance by structurally modifying separate and independent buildings on your property into one structurally dependent building. The construction plans dated January 20, 2017 do not show one structurally dependent building. It is therefore my determination that plans dated January 20, 2017 do not show a building that complies with the UDO definition for single-family detached dwelling and a modified zoning compliance permit is denied.
 

 This letter was part of Defendant's efforts to comply with this Court's decision in
 
 Long
 
 . After
 
 Long
 
 , plaintiff and Defendant sought to find an acceptable revision to the project to make it fit within the UDO requirements as set forth by
 
 Long
 
 . Several possible changes were discussed, such as moving the three buildings out of the CAMA setback area so they could be connected as one principal structure or reconfiguring the side buildings to be smaller accessory buildings, with the middle building as the principal structure. Plaintiff declined to make any changes, and ultimately Mr. Woody issued the 27 March 2017 letter. But Defendant was not requiring any particular revision to Plaintiff's project. Defendant has no duty to tell Plaintiff what she must do to comply with the UDO, although Defendant has worked extensively with Plaintiff and her representatives to consider alternatives. It is not the job of Defendant's Planning Department to direct the details of how to bring the project into compliance with the UDO; their job is to determine if Plaintiff's proposed plans comply with the UDO. Section 10.51 does not regulate plaintiff's "foundation[.]" The fact that Defendant may have suggested changes to plaintiff's foundation as
 
 one
 
 way to comply with both the UDO and CAMA, does not mean the UDO regulates foundations.
 

 Nor does the UDO require that a single family detached dwelling be "a single building[.]" As explained by
 
 Long
 
 , the dwelling may include "accessory structures" which are
 

 "subordinate in use and square footage" to a principal structure. UDO § 10.34. Even assuming that the two side "buildings" or "structures" are subordinate in use to the
 
 *94
 
 center "building," it is uncontested that all of the buildings are approximately 5,000 square feet. No building is
 
 *543
 
 subordinate in square footage to another so none can meet the definition of an "accessory structure."
 

 Id.
 

 at ----,
 
 787 S.E.2d at 840
 
 (citations and footnote omitted).
 

 And if labeling on plans, instead of actual building characteristics, were controlling, there would be no dispute here. Plaintiff could simply re-label the structures on the plans as whatever she likes that would comply with the UDO. According to Mr. Woody's letter, that is what she attempted to do.
 
 [6]
 
 Although in
 
 Long
 
 , --- N.C. App. ----,
 
 787 S.E.2d 835
 
 , the parties were dealing with plans on paper, when Plaintiff filed her complaint, the buildings were nearly complete so Defendant is dealing with actual structures. Giving a structure a new name on paper changes nothing; it is what it is.
 
 See, e.g.
 
 ,
 
 Pine Knoll Shores
 
 ,
 
 104 N.C. App. 79
 
 at 80-81,
 
 407 S.E.2d at 895-96
 
 . ( The defendant landowners called their structure a "ground cover," not a "deck," where zoning ordinance forbade construction of "other separate structures" on single-family residential lot; Court determined name of structure was not controlling and landowner had violated the ordinance by construction of a structure of "precisely sized wooden boards connected to one another so as to form a level, continuous surface covering a substantial area of the lot between the canal and house."). Plaintiff has failed to show she is likely to prevail on her claim that Section 10.51 of the UDO is unconstitutionally arbitrary or capricious as applied to her, and thus that is not a proper basis for the issuance of a preliminary injunction.
 

 2. Vagueness
 

 Plaintiff argues that "[t]he UDO is unconstitutionally vague to the extent it requires the wings of the home to be structurally dependent."
 

 [A] statute is unconstitutionally vague if it either: (1) fails to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited; or (2) fails to provide explicit standards for those who apply the law. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.
 

 Fryou
 
 ,
 
 244 N.C. App. at 125
 
 ,
 
 780 S.E.2d at 161
 
 (citation omitted).
 

 *544
 
 The trial court determined that Plaintiff is likely to prevail on her claim that Section 10.51 is unconstitutionally vague:
 

 LeTendre is likely to prevail on her claim that those provisions in the UDO that are barring her home from being a single-family detached dwelling are unconstitutionally vague. The UDO as written does not provide reasonable notice that a home like LeTendre's, in which the wings connected by enclosed, air conditioned hallways and have connected rooflines, would not meet the definition of a single-family detached dwelling. Those UDO provisions therefore fail to reasonably apprise property owners concerning what conduct they prohibit.
 

 Again, Plaintiff's argument is based upon an assumption that the UDO requires "structural dependency[,]" although it does not. In fact, even Plaintiff notes that "Section 10.51 of the UDO does not expressly include a requirement that the wings of a building be structurally dependent on one another in order for the building to be considered a dwelling." As explained in
 
 Long
 
 ,
 

 The UDO defines "DWELLING, SINGLE-FAMILY DETACHED" as follows: "A residential building containing not
 
 *95
 
 more than one dwelling unit to be occupied by one family, not physically attached to any other principal structure." UDO § 10.51. Thus, the definition of a Single Family Dwelling has five elements: (1) A building, (2) for residential use, (3) containing not more than one dwelling unit, (4) to be occupied by one family, and (5) not physically attached to any other "principal structure." The definition of a Single Family Dwelling includes portions that address the physical structure of the proposed dwelling: "a building," "containing not more than one dwelling unit," and "not physically attached to any other principal structure." ...
 

 ....
 

 Yet the definition of Single Family Dwelling clearly allows more than one "building" or "structure" to be constructed on the same lot, so the presence of three "buildings" alone does not disqualify the project. However, the remainder of the definition does disqualify the project. The last element in the definition of a Single Family Dwelling is "not physically attached to any other principal
 
 *545
 
 structure." UDO § 10.51. In other words, the Single Family Dwelling is "detached," which is part of the title. The UDO provides that "words used in the singular number include the plural number and the plural number includes the singular number, unless the context of the particular usage clearly indicates otherwise." UDO § 10.1.11. In the definition of Single Family Dwelling, the context does clearly indicate otherwise. We cannot substitute the word "buildings" for "a building" without rendering the last phrase of the definition, "not physically attached to any other principal structure" either useless or illogical. The Planning Director determined that the multiple buildings together function as a principal structure, but even if they are functionally used as one dwelling unit, each individual building is itself a "structure."
 
 See
 
 §§ 10.43, .83. Thus, each building is necessarily either an "accessory structure" or a principal structure. And respondents do not argue that the side buildings are "accessory structures;" they argue only that the entire project functions as one "principal structure." Although the ordinance does not define principal structure, it does define "accessory structures" as "subordinate in use and square footage" to a principal structure. UDO § 10.34. Even assuming that the two side "buildings" or "structures" are subordinate in use to the center "building," it is uncontested that all of the buildings are approximately 5,000 square feet. No building is subordinate in square footage to another so none can meet the definition of an "accessory structure." This would mean that each building is a principal structure, however a Single Family Dwelling only allows for one. In addition, the ordinary meaning of "principal" is in accord.
 
 See
 
 Webster's Seventh New Collegiate Dictionary 676 (1969). "Principal" is defined as "most important."
 

 Id.
 

 There can be only one "principal structure" on a lot in the SF District and that principal structure can be attached only to "accessory structures."
 

 Long
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 838-40
 
 (citations, brackets, and footnotes omitted).
 

 The UDO defines a single family detached dwelling as "[a] residential building containing not more than one dwelling unit to be occupied by one family,
 
 not physically attached
 
 to any other principal structure.
 

 *546
 
 UDO § 10.51."
 

 Id.
 

 at ----,
 
 787 S.E.2d at 838
 
 (emphasis added). Plaintiff is again arguing, as she did in
 
 Long, see
 

 id.
 

 at ----,
 
 787 S.E.2d at 840
 
 , that if the structures are
 
 connected
 
 , they function as and should be deemed as one "building" under the UDO.
 
 [7]
 
 But "connection" does not make three building into one, despite the function. As explained in
 
 Long
 
 ,
 

 Perhaps a more "absurd" result would be if we were to read the ordinances to focus only upon the "use" portion of Single Family Dwelling definition, as respondents argue, while ignoring the structural portion, since it would not matter how many "buildings" are connected by "conditioned hallways" if they are functioning as one dwelling for one family. Were we to adopt respondent Currituck County's interpretation, a project including ten 5,000 square
 
 *96
 
 foot buildings, all attached by conditioned hallways, which will be used as a residential dwelling for one family with a kitchen facility in only one of the buildings would qualify as a Single Family Dwelling. Respondents' interpretation would also be contrary to the stated purpose of the zoning, which calls for "very low density residential development" and "is intended to accommodate limited amounts of development in a manner that preserves sensitive natural resources, protects wildlife habitat, recognizes the inherent limitations on development due to the lack of infrastructure, and seeks to minimize damage from flooding and catastrophic weather events."
 

 Id.
 

 at ----,
 
 787 S.E.2d at 840-41
 
 (citation omitted).
 

 The words "physically attached" are not vague or difficult to understand; they mean the same thing as "connected."
 

 Id.
 

 at ----,
 
 787 S.E.2d at 838
 
 . However the structures are "physically attached"-whether by the foundation or by "air conditioned hallways"-Plaintiff's project includes three separate buildings which are
 
 physically attached
 
 to one another. The importance of the foundation of the structures comes only from the CAMA requirements, not the UDO. The CAMA permit will allow no building larger than 5,000 square feet and will not allow the three buildings to be structurally dependent upon one another. Plaintiff's
 
 *547
 
 project included three separate buildings from the beginning; it was intentionally designed this way to comply with CAMA requirements.
 

 The
 
 Long
 
 case answered the question of vagueness.
 

 Id.
 

 at ----,
 
 787 S.E.2d at 840-41
 
 . Although the UDO provisions can be difficult to read, as many ordinances and statutes are, they are not unconstitutionally vague. Section 10.51 "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "provide[s] explicit standards for those who apply the law[,]"
 
 Fryou
 
 ,
 
 244 N.C. App. at 125
 
 ,
 
 780 S.E.2d at 161
 
 , by plainly prohibiting more than one principal structure per lot, although allowing accessory structures.
 
 See
 

 Long
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 838-40
 
 . Plaintiff understood this also; the negotiations and plan revisions have been caused by Plaintiff's insistence on fitting a square peg into a round hole. The problem was created by the CAMA regulations and Plaintiff's decision to build within the CAMA setback area; these factors do not make the ordinance vague. Plaintiff is unlikely to prevail on her claim of unconstitutional vagueness, and thus that is not a proper basis for the issuance of a preliminary injunction.
 

 3. Equal Protection
 

 Plaintiff's final constitutional claim was regarding equal protection. The trial court's order did not address whether plaintiff was likely to prevail on her equal protection claim. Neither Plaintiff nor Defendant have addressed equal protection in their briefs on appeal.
 
 [8]
 

 An equal protection violation would require Plaintiff to show that Defendant treated her differently from other similarly situated property owners in its application of the UDO because in order
 

 [t]o establish an equal protection violation, [plaintiff] must identify a class of similarly situated persons who are treated dissimilarly. ... Thus, in order to properly assert an equal protection violation, Petitioner was required to allege and demonstrate that she was treated differently than other similarly situated individuals in some relevant way.
 

 Yan-Min Wang v. UNC-CH Sch. Of Med.
 
 ,
 
 216 N.C. App. 185
 
 , 204-05,
 
 716 S.E.2d 646
 
 , 658-59 (2011) (citation and quotation marks omitted). There has been no forecast of evidence that Defendant has applied its
 
 *548
 
 zoning ordinance in a manner that treats Plaintiff differently from other property owners in the SF District. Plaintiff is not likely to prevail on a claim for violation of her equal protection rights so it may not serve as the reason a preliminary injunction may issue.
 
 *97
 
 D. Preemption by North Carolina Building Code
 

 Plaintiff's fourth cause of action is that "Section 10.51 of the Currituck County UDO [i]s [p]reempted [b]y the North Carolina Building Code[.]" The trial court's order agreed with Plaintiff and found:
 

 The provisions in the UDO that prevent LeTendre's home from qualifying as a single-family detached dwelling also attempt to regulate matters already regulated by the North Carolina Building Code. Ms. LeTendre's home is governed [by] the Building Code, and the Building Code contains detailed provisions governing such matters as how the foundations of her home should be constructed and whether the wings of her home should be structurally dependent. Nothing in the Building Code requires the foundations of LeTendre's home to be structurally integrated, and nothing in the Building Code requires the wings of her home to be structurally dependent. The UDO provisions that bar her home from being a single family detached dwelling therefore require her home to be constructed in a way that the Building Code does not require.
 

 The trial court concluded:
 

 LeTendre is likely to prevail on her claim that the provisions of the UDO that are barring her home from being a single-family detached dwelling are preempted by the North Carolina Building Code because those provisions attempt to regulate matters of construction that are already comprehensively and exclusively regulated by the Building Code.
 

 We first note that neither Plaintiff's brief nor the trial court's order identifies which provisions of the North Carolina Building Code preempt Defendant's zoning ordinance, but Plaintiff's complaint identified the statutory basis for her claim as North Carolina General Statute § 143-138(e), which provides:
 

 Effect upon Local Codes.-Except as otherwise provided in this section, the North Carolina State Building Code shall apply throughout the State, from the time of
 
 *549
 
 its adoption. Approved rules shall become effective in accordance with G.S. 150B-21.3. However, any political subdivision of the State may adopt a fire prevention code and floodplain management regulations within its jurisdiction. The territorial jurisdiction of any municipality or county for this purpose, unless otherwise specified by the General Assembly, shall be as follows: Municipal jurisdiction shall include all areas within the corporate limits of the municipality and extraterritorial jurisdiction areas established as provided in G.S. 160A-360 or a local act; county jurisdiction shall include all other areas of the county. No such code or regulations, other than floodplain management regulations and those permitted by G.S. 160A-436, shall be effective until they have been officially approved by the Building Code Council as providing adequate minimum standards to preserve and protect health and safety, in accordance with the provisions of subsection (c) above. Local floodplain regulations may regulate all types and uses of buildings or structures located in flood hazard areas identified by local, State, and federal agencies, and include provisions governing substantial improvements, substantial damage, cumulative substantial improvements, lowest floor elevation, protection of mechanical and electrical systems, foundation construction, anchorage, acceptable flood resistant materials, and other measures the political subdivision deems necessary considering the characteristics of its flood hazards and vulnerability. In the absence of approval by the Building Code Council, or in the event that approval is withdrawn, local fire prevention codes and regulations shall have no force and effect. Provided any local regulations approved by the local governing body which are found by the Council to be more stringent than the adopted statewide fire prevention code and which are found to regulate only activities and conditions in buildings, structures, and premises that pose dangers of fire, explosion or related hazards, and are not matters in conflict with the State Building Code, shall be approved. Local governments may enforce the fire prevention code of the State Building Code using civil remedies authorized under G.S. 143-139, 153A-123, and 160A-175. If the Commissioner
 
 *98
 
 of Insurance or other State official with responsibility for enforcement of the Code institutes
 
 *550
 
 a civil action pursuant to G.S. 143-139, a local government may not institute a civil action under G.S. 143-139, 153A-123, or 160A-175 based upon the same violation. Appeals from the assessment or imposition of such civil remedies shall be as provided in G.S. 160A-434.
 

 A local government may not adopt any ordinance in conflict with the exemption provided by subsection (c1) of this section. No local ordinance or regulation shall be construed to limit the exemption provided by subsection (c1) of this section.
 
 [9]
 

 N.C. Gen. Stat. § 143-138
 
 (e) (2017). North Carolina General Statute § 143-138(e) merely sets forth the authority of the State to adopt building codes which apply throughout the state. Plaintiff's house is governed by the North Carolina Residential Code.
 

 Plaintiff again focuses her argument on her contention that the UDO requires "structurally dependent foundations[.]" Plaintiff submitted the affidavit of her contractor, Mr. Mancuso, who averred:
 

 80. The Building Code contains a chapter on foundations. I have reviewed and relied upon that chapter of the Building Code many times over the years and am personally familiar with it. An accurate copy of that chapter is attached as
 
 Exhibit 13
 
 . The Building Code's chapter on foundations applies to and governs the foundations in Ms. LeTendre's home. That chapter of the Building Code states that it "shall control the design and the construction of the foundation and foundation spaces for all buildings." That chapter comprehensively regulates the foundations of one and two family dwellings, and it has provisions governing matters like what materials must be used in a home's foundation, how the different components in a home's foundation must connect together and connect to other parts of the home, and what standards the components of a home's foundation must meet.
 

 81. Neither the Building Code's chapter on foundations, nor any other provision in the Building Code, requires the foundations of the three wings in Ms. LeTendre's home
 
 *551
 
 to be connected or requires Ms. LeTendre's home to have a single common foundation.
 

 82. Simply put, Ms. LeTendre's home is one building and one dwelling. It is one building for purposes of the Building Code, and it is considered one building as [that] term is understood and used in the local design and construction industry.
 

 Plaintiff also relies upon a determination by the North Carolina Building Code Council issued in August 2015. Plaintiff's project came under consideration by the Building Code Council based upon Plaintiff's appeal from the North Carolina Department of Insurance ("NCDOI"). A staff member of NCDOI determined, after
 

 his review of the building plans, coupled with his review of the Coastal Area Management Agency ("CAMA") permit application for the project, led him to conclude that the proposed occupancy more closely resembles a "hotel" and should be constructed in compliance with R-l type occupancy as mandated in the North Carolina Building Code ("NCBC").
 

 After discussion among Plaintiff's contractor, members of Defendant's staff, and NCDOI staff,
 

 an agreement was reached wherein Mr. Newns issued a residential building permit for the project with various modifications to construction standards and methods normally called for only in projects meeting R-3 occupancy standards found in the [North Carolina Building Code], but not in the [North Carolina Residential Code.] The additional requirements included sprinkler systems, handicap access, increased fire protection, emergency exits and the like.
 

 Plaintiff's contractor agreed to these requirements with the "express understanding that ... [Plaintiff] would solicit a formal interpretation from NCDOI regarding the occupancy classification and petition the County to remove all additional requirements
 
 *99
 
 not expressly mandated by the NCRC" if the NCDOI's determination that the building closely resembled a hotel" was reversed. On 28 May, 2015, a deputy commissioner of the NCDOI approved the determination that "if the property is 'used as a house,' it can be built according to NCRC standards, but if it were rented out as a 'vacation rental,' as shown in the CAMA application, it most closely resembles a Group R-l Occupancy and must be constructed
 
 *552
 
 in accordance with the NCBC." Plaintiff appealed this determination to the North Carolina Building Code Council, and the Council reversed the NCDOI ruling and concluded that "[t]his project meets the definition of a one family dwelling not more than three stories above grade plane in height with a separate means of egress, as required in NCRC section R101.2. Accordingly, the NCRC applies to this project."
 

 Plaintiff argues that
 

 Currituck County's application of the UDO attempts to regulate a home's foundations in a manner different from that prescribed by the Building Code. (
 
 See
 
 Doc. Ex. 116 ¶¶80-81) The construction of a home's foundation(s) is regulated by the Building Code, and nowhere in the Code is there a requirement that various wings of a home must be structurally dependent or share a common foundation.
 

 Plaintiff then footnotes that
 

 [t]hese conclusions are supported by the August 2015 ruling of the Building Code Council, which determined that the home depicted in the October 2013 plans is a "single-family dwelling." (Doc. Ex. 94-95, Ex. 11) Two building inspectors, including the County's Chief Building Inspector, have confirmed that the home is a single building for purposes of the Building Code. (Doc. Ex. 115 ¶78)
 

 The first problem with plaintiff's preemption argument is that the Currituck County UDO does not regulate the construction of foundations. Plaintiff is arguing only that the
 
 definition
 
 of a single family detached dwelling in the UDO somehow addresses the construction of foundations. The Planning Director's letter of 17 March 2017 also did not address any of the technical requirements of foundations. In addition, the determination by the North Carolina Building Code Council does not in any way control Defendant's application of its UDO.
 

 In
 
 Duggins v. Town of Walnut Cove
 
 , this Court rejected a similar argument that the town ordinance's definitions of "mobile home," "modular home," and "site-built home" were an "impermissible attempt to regulate construction practices."
 
 63 N.C. App. 684
 
 , 687,
 
 306 S.E.2d 186
 
 , 188 (1983). The plaintiffs contended that they should be allowed to install a mobile home in an area which allowed only modular and site-built homes.
 
 See
 
 id.
 

 Prior to purchasing the mobile home, "the plaintiffs described to Defendant's town clerk/zoning administrator the type of manufactured home they intended to erect on their property and were
 
 *553
 
 assured this home complied with local ordinances. Defendant issued a building permit to plaintiffs and accepted their payment of $200 as a water tap fee."
 
 Id.
 
 at 685,
 
 306 S.E.2d at 187
 
 . But when the plaintiffs tried to install the mobile home on their lot, they were informed that it was not allowed in that zoning district.
 

 Id.
 

 One of the plaintiffs' arguments on appeal was that
 

 [d]efendant's attempt to "zone out" mobile homes as defined in the ordinance exceeds Defendant town's statutory authority both because the zoning enabling act does not authorize Defendant to regulate the types of structures used for single-family residential purposes and because Defendant's ordinance constitutes a back door attempt to intrude into a field preempted by state and federal law.
 

 63 N.C. App. at 686
 
 ,
 
 306 S.E.2d at 188
 
 . Regarding building codes, the plaintiffs argued that because mobile homes and modular or site-built homes are governed by different building codes, "the zoning ordinance ... [has] the effect of distinguishing between structures used for the same purpose-single-family residences-based solely on the construction methods and materials used."
 
 Id.
 
 at 687,
 
 306 S.E.2d at 188
 
 . But this Court determined,
 

 We do not agree with plaintiffs' interpretation of the ordinance. It is obvious from the definitions in the ordinance that the different applicable building codes is not
 
 *100
 
 the only factor differentiating mobile homes from modular homes. Therefore, the ordinance does not have the effect suggested by plaintiffs. Defendant is clearly authorized by G.S. 160A-381 to regulate and restrict the location and use of any buildings or structures for residential and other purposes, and that is exactly what defendant has done in restricting the location of mobile homes.
 

 Similarly, plaintiffs attack the ordinance on the grounds it is an impermissible attempt to regulate construction practices.
 
 Defendant's ordinance was not intended to and does not have the effect of regulating construction practices in any way
 
 .
 
 Rather, the ordinance deals solely with the location and use of buildings and structures as the statute expressly authorizes. Plaintiffs' attempt to read more into defendant's enactment of the ordinance is not warranted.
 
 Accordingly, we hold both aspects of plaintiffs' first argument are meritless.
 

 Id.
 
 at 687,
 
 306 S.E.2d at 188-89
 
 (emphasis added).
 

 *554
 
 Defendant's UDO also "deals solely with the location and use of buildings and structures as the statute expressly authorizes. Plaintiff[']s[ ] attempt to read more into defendant's enactment of the ordinance is not warranted."
 

 Id.
 

 The trial court erred in concluding that Plaintiff is likely to prevail on her claim that UDO Section 10.51 impermissibly regulates construction practices and is preempted by the North Carolina Building Code. Plaintiff is unlikely to prevail on this claim so it is not a proper basis for a preliminary injunction.
 

 E. Inverse Condemnation
 

 Plaintiff's sixth cause of action is that "Currituck County [h]as [t]aken LeTendre's [p]roperty[.]" The trial court did not conclude and Plaintiff does not argue that the preliminary injunction could be based upon her alternative claim for inverse condemnation. Plaintiff's complaint alleges that "Section 10.51 of the Currituck County UDO, by itself and in combination with those County actions, assurances, and representations ... induced [her] to build" the project which now is deprived "of all economic value, market value, and utility." But since inverse condemnation is a claim for monetary compensation and not a claim to restrain the Defendant from taking some action, a preliminary injunction could not logically be based on inverse condemnation. We also note that under North Carolina General Statute § 40A-51, a Memorandum of Action must be filed for an inverse condemnation claim, and plaintiff has failed to do so.
 
 See
 
 N.C. Gen. Stat. § 40A-51(b) (2017) ;
 
 see also
 

 Cape Fear Pub. Util. Auth. v. Costa
 
 ,
 
 205 N.C. App. 589
 
 , 596,
 
 697 S.E.2d 338
 
 , 342 (2010) ("Defendant's counterclaim for inverse condemnation was thus subject to dismissal for its failure to comply with N.C. Gen. Stat. § 40A-51.") Since the preliminary injunction could not be based upon this claim, we will not speculate on it further, but we note Plaintiff would not be entitled to a preliminary injunction on this basis.
 

 F. Laches
 

 Plaintiff's eighth cause of action is that "Currituck County's [a]ttempts to [e]nforce Section 10.51 of the UDO [a]gainst the Home are [b]arred by [l]aches[.]" This claim is based upon her allegation that Currituck County had notice "that the Home as described in the Plans might not comply with the UDO" in December of 2013 when the Longs appealed the BOA's determination. In other words, Defendant has taken too long to oppose Plaintiff's plans; Defendant should have known better than to approve her plans in November 2013 and should have changed
 
 *555
 
 its position right away to join in the Longs' challenge.
 
 [10]
 
 The trial court did not rely upon laches in its issuance of the preliminary injunction, and Plaintiff has not addressed laches on appeal. But we do note that "a municipality cannot be estopped to enforce a zoning ordinance against a violator by the conduct of its officials in encouraging or permitting such violator to violate such ordinance in times past."
 
 *101
 

 Fisher
 
 ,
 
 232 N.C. at 635
 
 ,
 
 61 S.E.2d at 902
 
 . Therefore, plaintiff is not entitled to a preliminary injunction on the basis of a likelihood of success of her claim of laches.
 

 G. Common Law Vested Right
 

 Plaintiff's last claim is that even if she is not likely to prevail on any of her other claims, she still has a common law vested right to use the project. The trial court concluded that Plaintiff was likely to prevail on her vested right claim:
 

 LeTendre is likely to prevail on her claim that she has a vested right to complete and use her home as approved by the County in November 2013. At the time that LeTendre constructed her home, starting in the spring of 2015, she had valid approvals from Currituck County for that home's construction. This Court had ruled in December 2014 that the County's approval of her home was valid, and there was no stay in place to prevent this Court's order from taking effect. As a result, when LeTendre spent substantial sums in reliance on her approvals from the County to construct her home, she was relying on valid governmental approvals. Her reliance on those approvals was also reasonable and in good faith.
 

 Plaintiff argues that
 

 [t]o establish a common law vested right, an owner must obtain an approval for the development and make substantial expenditures in good faith reliance on that approval.
 
 River Birch Assocs. v. City of Raleigh
 
 ,
 
 326 N.C. 100
 
 , 112,
 
 388 S.E.2d 538
 
 , 544-45 (1990). LeTendre received approval of her home's construction in the County's November 2013 Letter of Determination and March 2015 building permit. She then spent over $4 million building her home in
 
 *556
 
 reliance on those approvals. (
 
 See
 
 Doc. Ex. 10 ¶32) Thus, she made substantial expenditures in good faith reliance on governmental approvals.
 

 This Court described how a landowner may acquire a vested right to use her land in a certain way in
 
 Browning-Ferris Industries v. Guilford County Bd. of Adj.
 
 :
 

 The common law vested rights doctrine is rooted in the due process of law and the law of the land clauses of the federal and state constitutions and has evolved as a constitutional limitation on the state's exercise of its police powers. A party's common law right to develop and/or construct vests when: (1) the party has made, prior to the amendment of a zoning ordinance, expenditures or incurred contractual obligations substantial in amount, incidental to or as part of the acquisition of the building site or the construction or equipment of the proposed building; (2) the obligations and/or expenditures are incurred in good faith; (3) the obligations and/or expenditures were made in reasonable reliance on and after the issuance of a valid building permit, if such permit is required, authorizing the use requested by the party; and (4) the amended ordinance is a detriment to the party. The burden is on the landowner to prove each of the above four elements.
 

 126 N.C. App. 168
 
 , 171-72,
 
 484 S.E.2d 411
 
 , 414 (1997) (citations, quotation marks, and brackets omitted).
 

 As described in
 
 Browning-Ferris
 
 , the first element of a vested rights claim is that "the party has made,
 
 prior to the amendment of a zoning ordinance
 
 , expenditures or incurred contractual obligations substantial in amount, incidental to or as part of the acquisition of the building site or the construction or equipment of the proposed building[.]"
 
 Id.
 
 at 171,
 
 484 S.E.2d at 414
 
 (emphasis added). Here, the zoning ordinance has not been amended; the only question from the beginning has been whether Plaintiff's house is a "single-family detached dwelling" as defined by Section 10.51 of the UDO.
 
 Long
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 836
 
 ("On appeal, there is no real factual issue presented but only an issue of the interpretation of the UDO. The parties have made many different arguments, with petitioners focusing upon the applicable definitions and provisions of the UDO, and respondents focusing upon the intended use and function of the project. This case ultimately turns
 
 *557
 
 upon the definition of a single family detached dwelling." (citations, quotation marks, and brackets omitted) ). Plaintiff is correct in noting that her project was initially approved by Defendant:
 

 *102
 
 The 22 November 2013, LETTER OF DETERMINATION from the Planning Director describes the project as follows: "The plans indicate a three-story main building that includes cooking, sleeping, and sanitary facilities; as well as two-story side buildings that include sleeping and sanitary facilities. The building plans also show two conditioned hallways connecting rooms within the proposed single family detached dwelling." This is an accurate and undisputed description of the project. The BOA affirmed the Planning Director's description, and the Superior Court affirmed the BOA's decision.
 

 Id.
 

 at ----,
 
 787 S.E.2d at 839
 
 .
 

 But the Longs appealed and that case proceeded on appeal to this Court, where it was resolved by issuance of
 
 Long
 
 in favor of the petitioner-plaintiffs who argued against plaintiff LeTendre.
 
 See
 

 id.
 

 , --- N.C. App. ----,
 
 787 S.E.2d 835
 
 . Thus, as to Plaintiff's argument that she relied upon "the County's November 2013 Letter of Determination and March 2015 building permit[,]" Plaintiff knew the Letter of Determination as affirmed by the BOA and then the Superior Court was on appeal and was specifically warned that this Court may not find in her favor Plaintiff did not get her building permit and begin construction until
 
 after
 
 the appeal.
 
 See generally
 
 id.
 

 But Plaintiff argues that unless someone took
 
 additional
 
 legal action to stop her, she was still entitled to proceed to build: "With a valid building permit in hand, and without any injunction in place, proceeding with her home was a reasonable decision made in good faith." Thus, Plaintiff's vested rights theory is that she could acquire a common law vested right to build and occupy her house simply by proceeding with construction quickly, even while aware that her right to do so was on appeal and could be reversed.
 

 Plaintiff's interpretation of vested rights is simply not supported by the law.
 
 See generally
 

 Fisher
 
 ,
 
 232 N.C. 629
 
 ,
 
 61 S.E.2d 897
 
 . First, Plaintiff's interpretation would deprive Defendant of its right and duty to exercise the police power if a landowner building a structure in violation of its zoning ordinance simply acts fast enough to complete the work before a legal challenge to the landowner's project can be completed. Although
 
 Fisher
 
 did not specifically address vested rights, the situation presented is very similar to this case.
 
 See generally
 
 id.
 

 In
 
 Fisher
 
 , the City of Raleigh
 
 *558
 
 sued to enjoin the Defendant "landowners from carrying on business in a residential zoning district in violation of a zoning ordinance."
 
 Id.
 
 at 630,
 
 61 S.E.2d at 898
 
 . The Defendants had been "operating a bakery and sandwich company" at an address within a residential zoning district.
 
 Id.
 
 at 631,
 
 61 S.E.2d at 899
 
 (quotation marks omitted). The property had been zoned as residential since 1923, and in 1936 the Defendants acquired the land and constructed the house in which the business operated.
 
 See
 

 id.
 
 at 632,
 
 61 S.E.2d at 900
 
 . Defendants operated the business from this location "with the full approval and consent of the officials of the City of Raleigh" "for at least ten years."
 

 Id.
 

 The Defendants also "increased their facilities from the operation of the business" during this time, investing "at least $75,000.00, which [would] be lost in case they are precluded from continuing their commercial operations[.]
 
 [11]
 

 Id.
 

 (quotation marks omitted). But in 1948, the City of Raleigh notified Defendants they must "discontinue their business operations within said residential district[;]" the Defendants refused to comply, leading to the lawsuit to enjoin them from continuing operation of the business.
 
 Id.
 
 at 631,
 
 61 S.E.2d at 899-900
 
 (quotation marks omitted),
 

 The Supreme Court determined that the City of Raleigh could not be estopped from enforcing "its zoning ordinance against the defendants" despite "the fact that its officials have encouraged or permitted them to violate it for at least ten years."
 
 Id.
 
 at 634,
 
 61 S.E.2d at 900
 
 . While the Court recognized Defendants' good faith reliance upon the City's acquiescence, and even encouragement,
 
 *103
 
 of the operation of the business for many years
 
 and
 
 their substantial expenditures based upon that reliance, it determined that because enforcement of the zoning ordinances is within the police power of the City, the City could change its position and require the business to cease operation in that location:
 

 In enacting and enforcing zoning regulations, a municipality acts as a governmental agency and exercises the police power of the State. The police power is that inherent and plenary power in the state which enables it to govern, and to prohibit things hurtful to the health, morals, safety, and welfare of society. In the very nature of things, the police power of the State cannot be bartered away by contract, or lost by any other mode.
 

 *559
 
 This being true, a municipality cannot be estopped to enforce a zoning ordinance against a violator by the conduct of its officials in encouraging or permitting such violator to violate such ordinance in times past.
 

 Undoubtedly this conclusion entails much hardship to the defendants. Nevertheless, the law must be so written; for a contrary decision would require an acceptance of the paradoxical proposition that a citizen can acquire immunity to the law of his country by habitually violating such law with the consent of unfaithful public officials charged with the duty of enforcing it.
 

 Id.
 
 at 635,
 
 61 S.E.2d at 902
 
 (citations omitted). The November 2013 Letter of Determination could not create a vested right for Plaintiff to build the project as planned, particularly since that letter was
 
 immediately
 
 challenged, and she did not even begin construction until much later.
 
 See generally
 
 id.
 

 We have no doubt that Defendant's Planning Director was acting in good faith in approving Plaintiff's plans, but Plaintiff could not in good faith rely upon the November 2013 letter to build the house, where a legal challenge to the project was pending.
 

 Our Supreme Court has also recognized that a landowner cannot in good faith acquire a vested right if the landowner knows of a pending amendment to a zoning ordinance which would change the use of the land:
 

 The "good faith" which is requisite under the rule of
 
 Warner v. W & O, Inc.,
 
 supra
 

 , is not present when the landowner, with knowledge that the adoption of a zoning ordinance is imminent and that, if adopted, it will forbid his proposed construction and use of the land, hastens, in a race with the town commissioners, to make expenditures or incur obligations before the town can take its contemplated action so as to avoid what would otherwise be the effect of the ordinance upon him.
 

 Town of Hillsborough v. Smith
 
 ,
 
 276 N.C. 48
 
 , 56,
 
 170 S.E.2d 904
 
 , 910 (1969).
 

 In
 
 Finch v. City of Durham
 
 , the plaintiffs planned to build a hotel on a tract of land zoned as Office-Institutional, which would allow hotels.
 
 See
 

 Finch
 
 ,
 
 325 N.C. 352
 
 , 355-56,
 
 384 S.E.2d 8
 
 , 10 (1989). The plaintiffs worked on planning the motel for several years and leased the property with an option to purchase it at the end of the lease.
 
 See
 

 id.
 
 at 356-60,
 
 384 S.E.2d at 10-12
 
 . In 1984, the plaintiffs entered into an agreement with
 
 *560
 
 Red Roof Inns providing for Red Roof Inns to construct the motel and lease the property from plaintiffs.
 
 See
 
 id.
 

 The plaintiffs had to exercise their option to purchase by giving notice by 1 May 1985; if they did not, the lease would end in June 1985.
 
 See
 
 id.
 

 The plaintiffs exercised the option, but a rezoning request for the property was under consideration during April 1985, and on 6 May 1985, the Durham City County adopted an amendment to the zoning, changing it back to R-10, residential.
 
 See
 

 id.
 
 at 355-60,
 
 384 S.E.2d at 10-12
 
 . Therefore, when the plaintiffs exercised the option to purchase, they knew that a proposed change to the zoning was pending, although it had not yet been approved.
 
 See generally
 

 id.
 
 at 356-57,
 
 384 S.E.2d at 10-11
 
 .
 

 The plaintiffs brought a declaratory judgment and damages lawsuit against Durham with claims quite similar to this case which included
 

 six claims: (1) that the zoning ordinance be invalidated as arbitrary, capricious, discriminatory and unreasonable; (2) that the zoning ordinance be invalidated as a "taking" under the state and federal Constitutions; (3) that the City of Durham be found
 
 *104
 
 liable for inverse condemnation under N.C.G.S. § 40A-51, and pay damages of $700,000; (4) that the City of Durham be estopped from enforcing the zoning ordinance and the subsequent general ordinance requiring a use permit; (5) that should the zoning ordinance be invalidated, the City of Durham be found liable for a "temporary taking" and plaintiffs be compensated under N.C.G.S. § 40A-51 in the amount of $100,000; and (6) that the City of Durham be found liable under
 
 42 U.S.C. § 1983
 
 for a taking and compensate plaintiffs in the amount of $700,000 and costs and attorney's fees.
 

 Id.
 

 at 358
 
 ,
 
 384 S.E.2d at 11
 
 .
 

 Some of the plaintiffs' claims were dismissed by summary judgment but some proceeded to a jury trial.
 
 See
 

 id.
 
 at 358,
 
 384 S.E.2d at 11-12
 
 . But on appeal of various issues and rulings, the Supreme Court ruled in favor of the City of Durham on all claims.
 
 See
 

 id.
 

 ,
 
 325 N.C. 352
 
 ,
 
 384 S.E.2d 8
 
 . Regarding the plaintiffs' decision to exercise their option to purchase despite knowledge of a pending proposal to change the zoning, the Court stated:
 

 [W]here an investor knows of a pending ordinance change proposed by a city planning board to the city council, the investor has no valid claim that he relied upon the prior ordinance in guiding his investment decision. An investor
 
 *561
 
 may speculate on regulatory changes, but the purchase price is irrelevant to the reasonableness of the current restriction. To hold otherwise would constitute a windfall to the investor at taxpayer expense.
 

 In analyzing the distinct investment-backed expectations of plaintiffs, we note the City Council enacted the zoning change on 6 May 1985, seven days after plaintiffs were under an equitable obligation to perform the purchase contract. However, the undisputed evidence shows that plaintiffs chose to exercise their option to purchase the property on 29 April 1985.
 
 This was some twenty-seven days after plaintiffs knew of the recommendation by the Durham Planning and Zoning Commission to rezone the property to R-10. Plaintiffs' expectations of investment return were in fact based on a speculative risk that the Durham City Council would not rezone the property to prohibit the proposed Red Roof Inn project.
 

 Plaintiffs argue that exercise of the option was necessary to protect prior financial investment in the property. It is axiomatic, however, that the purpose of an option contract is to minimize investment exposure to adverse changes in the business environment by postponing for an extended period the decision to accept or reject an offer.
 
 When such changes threatened, plaintiffs chose to ignore the warning clouds. They cannot now say that they reasonably expected an investment return untroubled by zoning changes
 
 .
 

 Finch v. City of Durham
 
 ,
 
 325 N.C. 352
 
 , 366-67,
 
 384 S.E.2d 8
 
 , 16-17 (1989) (emphasis added) (citations omitted).
 

 As noted above, vested rights cases are normally based upon an actual or pending
 
 amendment
 
 to a zoning ordinance after a landowner has made substantial expenditures or entered into contractual obligations as part of developing the land. Here, there was no change in zoning and Defendant's action which Plaintiff seeks to permanently enjoin is its enforcement of this Court's mandate from litigation challenging Plaintiff's project which was pending before a building permit was issued or any construction occurred. Although we are not aware of a North Carolina case which has directly held that a landowner may not acquire a vested right to develop land in a certain way where there is pending litigation directly challenging the proposed development, we conclude that
 
 actual
 
 litigation challenging the plan is a far stronger
 
 *562
 
 factor in eliminating the landowner's reasonable expectations than the landowner's knowledge of a pending rezoning proposal, as in
 
 Finch
 
 .
 
 See generally
 

 id.
 

 ,
 
 325 N.C. 352
 
 ,
 
 384 S.E.2d 8
 
 . In addition, although in dicta, our Supreme Court has cited with approval several cases from other states which do address whether vested rights may accrue when the landowner knows of a pending lawsuit which may affect use of the land:
 

 In
 
 Omaha Fish & Wildlife Club, Inc. v. Community Refuse Disposal, Inc.
 
 ,
 
 213 Neb. 234
 
 ,
 
 329 N.W.2d 335
 
 (1983), the Nebraska
 
 *105
 
 Supreme Court refused to apply the doctrine of "vested rights" for the benefit of defendant landowner. That court found that expenditures made by defendant with knowledge that a lawsuit had been filed challenging his proposed use were not made in good faith.
 

 In an analogous situation, the Supreme Court of Hawaii held that a resort developer proceeded at his own risk where he made expenditures despite notice that a petition had been certified for a public referendum which would (and, when passed, did) prohibit the proposed use. The court refused to apply the "vested rights" or "equitable estoppel" doctrines to allow property rights to vest.
 
 County of Kauai v. Pacific Std. Life Ins.
 
 ,
 
 65 Haw. 318
 
 ,
 
 653 P.2d 766
 
 (1982),
 
 appeal dismissed
 
 ,
 
 460 U.S. 1077
 
 ,
 
 103 S.Ct. 1762
 
 ,
 
 76 L.Ed.2d 338
 
 (1983).
 

 In
 
 Bosse v. City of Portsmouth
 
 ,
 
 107 N.H. 523
 
 ,
 
 226 A.2d 99
 
 (1967), the Pace Industrial Corporation had successfully persuaded the local administrative body to rezone its particular tract from residential to light industrial. Adjoining landowners had sought two injunctions to prevent the proposed use, and during the hearings, the trial court had twice warned Pace that it proceeded with construction at its own peril. The New Hampshire Supreme Court held that the designation change procured by Pace constituted unlawful "spot zoning" and stated that Pace had taken a "calculated risk" in proceeding with construction after plaintiffs had twice instituted legal proceedings seeking to enjoin the construction. Quoting from the Master's order below, the court went on to note:
 

 " 'Under the circumstances, and considering the fact that the Pace Industrial Corporation was aware that this was a Residential Zone at the time the purchase was made, and was aware shortly
 
 *563
 
 after the passage of the ordinance that the validity of this particular zone would be attacked, the Master finds that no vested interest accrued to Pace Industrial Corporation.' "
 

 Id.
 
 at 532,
 
 226 A.2d at 107
 
 .
 

 Finally, in an often-cited Florida Supreme Court case,
 
 Sakolsky v. City of Coral Gables
 
 ,
 
 151 So.2d 433
 
 (Fla. 1963), that court held that knowledge by a developer that a political contest in which the success of certain candidates might alter the voting pattern of the municipal body did not prevent good faith reliance on an act of the current governing body. However, the court was careful to point out that
 

 "[t]he effect of pending litigation directly attacking the validity of a permit or zoning ordinance, or the effect of an eventual determination that such permit was invalid, may present a very different problem. The decision in the instant case was not rested on any showing that petitioner, at the time he acted in reliance on the permit granted him, was a party defendant in legal action directly attacking its validity, that he had any notice that his permit might have been invalid in its inception, or that its revocation was in fact required in the public interest."
 

 Id.
 

 at 436
 
 (footnote omitted).
 
 See generally
 
 Heeter,
 
 Zoning Estoppel: Application of the Principles of Equitable Estoppel and Vested Rights to Zoning Disputes
 
 , 1971 Urban L. Ann. 63, 80.
 

 A trial court could conclude that application of the "vested rights" doctrine is inappropriate on the facts of this case and hold that when the landowner here incurred expenses with the knowledge that a lawsuit had been filed challenging the validity of the zoning ordinance amendment under which the landowner had obtained his building permit, he proceeded at his peril and thereby acquired no vested rights in the use of the property which is prohibited as a result of a judicial declaration that the ordinance amendment was invalid. In such a situation, it could not be said that the landowner had expended funds
 
 *564
 
 in good faith and in reasonable reliance upon a building permit issued pursuant to the challenged amendment.
 

 Godfrey v. Zoning Bd. of Adjustment
 
 ,
 
 317 N.C. 51
 
 , 64 n.2,
 
 344 S.E.2d 272
 
 , 280 n.2 (1986).
 

 *106
 
 Here, Plaintiff also took a calculated risk to proceed with construction while litigation challenging her project's approval was pending. Plaintiff could not accrue a vested right to construct or occupy the project where she knew of the potential effect of pending litigation-particularly since the Plaintiff herself was a party to that litigation. The litigation in
 
 Long
 
 challenged Defendant's approval of Plaintiff's plans, but Plaintiff decided, upon consideration of many factors as described in her affidavit, she would proceed with construction.
 
 See generally
 

 Long,
 
 --- N.C. App. ----,
 
 787 S.E.2d 835
 
 . Plaintiff believed she would prevail on the
 
 Long
 
 appeal because her plans had been approved by the BOA and by the Superior Court, so she demanded a building permit and sought to complete construction before the
 
 Long
 
 appeal was concluded. After issuance of the
 
 Long
 
 opinion, Plaintiff sought the preliminary injunction at issue here so she could continue to build and use the project. Plaintiff even moved to dismiss this appeal as moot because she had completed the project in spite of the issuance of the opinion in
 
 Long
 
 .
 

 Plaintiff also argues that since no one stopped her, she could continue to build. Defendant issued the building permit, which it had a duty to do based upon the Superior Court's approval of the BOA's ruling. Plaintiff argues that either Defendant or the Longs should have sought injunctive relief against her to stop her construction. But in
 
 Godfrey
 
 , our Supreme Court rejected a similar argument:
 

 We disagree with the suggestion of the panel below that plaintiffs and others similarly situated must resort to obtaining or attempting to obtain injunctive relief in order to protect their property interests against unlawful actions of a zoning board. Plaintiffs were well within their rights in electing to challenge the 1980 amendment through a declaratory judgment action rather than attempting, possibly in vain, to raise sufficient bond in order to procure an injunction.
 

 A suit to determine the validity of a city zoning ordinance is a proper case for a declaratory judgment. The plaintiffs, owners of property in the adjoining area affected by the ordinance, are parties in interest entitled to maintain the action.
 

 *565
 

 Jackson v. Board of Adjustment
 
 ,
 
 275 N.C. 155
 
 ,
 
 166 S.E.2d 78
 
 (1969) ;
 
 Zopfi v. City of Wilmington
 
 ,
 
 273 N.C. 430
 
 ,
 
 160 S.E.2d 325
 
 (1968).
 

 The adjoining property owners should not be called upon to suffer to protect the financial investment of one who acts at his own peril with forewarning of the possible consequences. If the law were otherwise, there would be no protection from a zoning board which, unlike the situation before us, might act from purely corrupt motives. If one, in a situation such as the one at bar, could be assured that a major investment would be protected regardless of the outcome of his gamble, a comprehensive zoning ordinance would offer little or no protection to those who have relied upon that ordinance.
 

 Godfrey,
 

 317 N.C. at 67
 
 ,
 
 344 S.E.2d at 281
 
 (citations omitted).
 

 Just as in
 
 Godfrey
 
 , neither Defendant nor adjacent property owners were required to take
 
 additional
 
 legal action "to protect the financial investment of one who acts at his own peril with forewarning of the possible consequences."
 

 Id.
 

 Plaintiff knew of the potential consequences of her decision to construct the home as it is designed and in the location she chose. She did not even
 
 begin
 
 construction until after the Superior Court order in
 
 Long
 
 was on appeal, so if she did not know before then, she knew about the potential for reversal when that appeal was taken. Both the Long's counsel and Defendant specifically warned Plaintiff of the risks of proceeding with construction. Plaintiff knowingly chose to gamble that the order in
 
 Long
 
 would not be reversed, and she lost that gamble. The consequences of delaying construction may have also been harsh, and Plaintiff had to make a difficult choice, but the choice was hers to make:
 

 The ultimate result in cases such as this may indeed be harsh. As this Court said in
 
 City of Raleigh v. Fisher
 
 ,
 
 232 N.C. 629
 
 ,
 
 61 S.E.2d 897
 
 (1950) :
 

 Undoubtedly this conclusion entails much hardship to the Defendants. Nevertheless, the law must be so written; for
 
 *107
 
 a contrary decision would require an acceptance of the paradoxical proposition that a citizen can acquire immunity to the law of his country by habitually violating such law with the consent of unfaithful public officials charged with the duty of enforcing it.
 

 *566
 

 Id.
 
 at 67,
 
 344 S.E.2d at 281-82
 
 . Plaintiff is not likely to prevail on her vested rights claim, and thus it is not a proper basis for a preliminary injunction.
 

 V. Conclusion
 

 We have examined each of Plaintiff's causes of action and determined that none have a likelihood of success for the purposes of entering a preliminary injunction. Because the order below must be reversed, we need not address Defendant's other contentions of why Plaintiff's preliminary injunction should be reversed, including arguments that Plaintiff failed to properly appeal the March 2017 determination letter from Mr. Woody; that Plaintiff's claims are barred by the statute of limitations; that Plaintiff has unclean hands; and that Plaintiff has an adequate remedy at law.
 

 On
 
 de novo
 
 review, Defendant has borne its burden of showing that the trial court's preliminary injunction was erroneous. Even if Plaintiff has demonstrated the potential for harm and substantial financial loss, she has not demonstrated a likelihood of success on any of her causes of action. The preliminary injunction is hereby reversed. "[T]he mandate of an appellate court is binding on the trial court, which must strictly adhere to its holdings."
 
 Campbell v. Church
 
 ,
 
 51 N.C. App. 393
 
 , 394,
 
 276 S.E.2d 712
 
 , 713 (1981). This matter is remanded to the trial court for further proceedings consistent with this Court's opinion in
 
 Long
 
 and this opinion.
 

 REVERSED and REMANDED.
 

 Judges DAVIS and ARROWOOD concur.
 

 [1]
 

 Section 10.51 of the UDO does not permit the principal structure to be "physically attached" to any other principal structure, so the last sentence of this finding is not entirely accurate; this Court interpreted the UDO in
 
 Long
 
 and determined otherwise.
 
 Long
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 838
 
 .
 

 [2]
 

 Plaintiff's complaint has 69 pages with 372 paragraphs of allegations. The record includes 651 pages of exhibits. In comparison, this opinion is relatively short.
 

 [3]
 

 It appears this conclusion was actually addressing the zoning enabling statutes since that is the only legal basis the trial court mentions along with the "health, safety, morals, or the general welfare" language, but it is the only conclusion which uses the word "arbitrary[.]"
 

 [4]
 

 As a federal district court case,
 
 Browning-Ferris
 
 is from a federal trial court, and is not binding upon this Court.
 

 [5]
 

 Again, Plaintiff proposed an amendment to the UDO which would allow her project to be permitted as a single family detached dwelling, but the Currituck County Board of Commissioners rejected it.
 

 [6]
 

 Mr. Woody's letter provides, "Other than modification of language on the construction plan sheets, there appears to be no material difference between the plans used to construct the three structurally separate and independent buildings and the construction plans dated January 20, 2017."
 

 [7]
 

 For example, the affidavit from Plaintiff's architect states that "[o]n the October 10, 2013 plans, because the wings were connected with air conditioned hallways and their roof lines were connected, the wings were integrated and connected such that the entire home would be considered a single building and a single dwelling in the design and construction industry."
 

 [8]
 

 Because a trial court's order must be affirmed if there is any legal basis for the order, even one other than stated in the order,
 
 see generally
 

 Shore
 
 ,
 
 324 N.C. at 428
 
 ,
 
 378 S.E.2d at 779
 
 , we are briefly addressing equal protection. In addition, plaintiff was unwilling to concede at oral argument that any one of the nine claims may not support the preliminary injunction.
 

 [9]
 

 Subsection (c1) deals with elevators in private clubs and religious organizations, so it is not relevant to this case.
 
 See
 

 N.C. Gen. Stat. § 143-138
 
 (c1) (2017).
 

 [10]
 

 In
 
 Long
 
 , Plaintiff and Defendant were in agreement.
 
 See
 

 Long
 
 , --- N.C. App. ----,
 
 787 S.E.2d 835
 
 . Defendant is now carrying out this Court's mandate in
 
 Long
 
 , in opposition to Plaintiff.
 

 [11]
 

 To put the investment of $75,000.00 in context, according to the United States Department of Labor, Bureau of Labor Statistics' Consumer Price Index calculator, this expenditure in 1940 would be equivalent to over $1,300,000.00 today.
 
 See
 
 United States Department of Labor, Bureau of Labor Statistics, Databases, Tables & Calculators by Subject, CPI Inflation Calculator-https://www.bls.gov/data/inflation_calculator.htm.